# GEORGE W. DAVIS v. H. A. FORMAN et al., Appellants.

### Division One, June 14, 1910.

1. **EQUITY SUIT: Jury.** A suit on a note is converted into one in equity by a cross-bill to have it cancelled, and is triable by the court. But the court has authority to take the opinion of a jury on any specific questions of fact included in the issues made by the pleadings; but the jury's verdict is merely advisory and may be rejected by the chancellor.

2. ——: ——: **Issues When Framed.** The statute does not prescribe when the issues to be submitted to a jury in a suit in equity are to be framed, whether before or after the evidence is heard, but leaves that matter to the discretion of the chancellor.

3. ——: ——: **Verdict by Nine Jurors.** The provision of the constitutional amendment permitting nine jurors to render a verdict in a civil action, applies to a jury called by a chancellor in a suit in equity.

4. ——: **Finding of Facts.** Where the testimony is oral in a suit in equity, the chancellor, who observes the living effects of the trial, is in a better position to pronounce judgment on the weight of the testimony than is the appellate court.

5. **FRAUD: Acquiescence: Delay in Rescinding Contract.** A party is not barred from asserting a transaction to be fraudulent by acquiescence therein and delay in rescinding it, if there were no facts or circumstances to put him on such inquiry as would have led to discovery.

6. ——: ——: ——: **Concealment: Misrepresentations Concerning Stocks.** If the only misrepresentation concerning stock sold by defendants to plaintiff had related wholly to their value, delay and acquiescence would bar a rescission; but where defendants represented to plaintiff, who knew nothing of the bank stocks sold him, that they owned certain of these stocks, that they regarded them very highly, that they were not for sale, that one of them had formerly been bank examiner and in that capacity discovered that the bank had a million dollars of undisclosed assets which did not appear in its printed statements, that he had kept in close communication with its president and knew his purpose to shortly increase its capital

stock from one million to two million dollars, that the stock was now actually worth $400 per share, that they knew of none of it for sale, but thought they knew an old German who lived in the south part of the city who had owned some of the stock and they would ascertain if he would not sell for $360—thus leading plaintiff to believe he was getting information that was not obtainable by the public, and selling their own stock to him at $360, and thereby inducing him to part with his money to purchase it at a price which was at that time at least ten dollars a share higher than they could otherwise have sold it for—there was nothing to put plaintiff on inquiry as to the ownership of the stock, and his acquiescence and delay to rescind for three years, do not bar his right to rescind, promptly exercised when he discovered the fraud. Nor was it immaterial whose stock it was that plaintiff bought, nor were the representations immaterial.

7. ——: ——: ——: ——: ——: **Estoppel.** One who has by misrepresentation and concealment drawn another into a contract is in no position to complain that he trusted too long in the truth of his statements and might by inquiry have discovered sooner that they were false, and therefore because of his delay cannot rescind.

8. ——: **Rescission of Contract: Collection of Dividends After Suit Brought.** After plaintiff had tendered the dividends earned by the bank stock sold to him, and the certificate, and demanded a rescission of the contract by which he had purchased the stock, and had been refused, he was justified, after suit was brought for rescission, in collecting further dividends during the pendency of the suit and holding them at the disposal of the court.

Appeal from St. Louis City Circuit Court.—*Hon. Chas. Claflin Allen,* Judge.

AFFIRMED.

*Chester H. Krum, Nathan Frank* and *R. A. Jones* for appellants.

(1) There was no issue "made up" in accordance with the statute on which the opinion of a jury could be taken. R. S. 1899, secs. 691 and 692. What the statute contemplates is shown by Besshears v. Rowe, 46 Mo. 501. What the court really did was to

try the whole case by jury—a course sufficiently characterized by Bray v. Thatcher, 28 Mo. 129. (2) The delay of respondent for more than three years to repudiate and rescind is, under the facts in evidence, negligence and acquiescence, barring the right to the intervention of a court of equity, and respondent should therefore be remitted to his remedy at law. Upton v. Tribilcock, 91 U. S. 54; Jones v. Rush, 156 Mo. 374; 2 Pomeroy, Eq. Jur., sec. 917, note. (a) Lapse of time, when it does not operate as a positive or statutory bar, operates as an evidence of assent, acquiescence or waiver, and a delay which might have been of no consequence in an ordinary case, may be amply sufficient to bar the title of equitable relief when the property is of a speculative character. Bliss v. Prichard, 67 Mo. 187; Smith v. Washington, 11 Mo. App. 525; Hatcher v. Hatcher, 139 Mo. 626; Dennis v. Jones, 14 Atl. (N. J. App.) 913; James v. James, 55 Ala. 534. (b) One who claims to have been drawn into a fraudulent sale must exercise reasonable care and vigilance to discover the fraud. Richardson v. Low, 149 Fed. 625; Johnston v. Mining Co., 148 U. S. 370; Bank v. Hunt, 76 Mo. 39. (c) And the duty of rescission will arise in cases of the discovery of suspicion of the fraud, or upon being put upon notice, from the time when by reasonable diligence the fraud could have been discovered. Bigelow on Fraud, p. 438; Bassett v. Brown, 105 Mass. 551. (d) The matter of diligence in rescission is peculiarly applicable to speculative property. McLean v. Clapp, 141 U. S. 432; Grimes v. Sanders, 93 U. S. 62. (e) Allegation of ownership, immaterial. Downs v. Self, 67 S. W. 897. (f) The undisputed fact is that respondent was put on notice of the alleged fraud within a few weeks after its asserted perpetration, but he waited some three years before he even made complaint. (3) The respondent by collecting and appropriating to his own use dividends on the stock, after he obtained positive knowl-

edge of the alleged fraud, thereby ratified the sale and waived his right to rescind. Shapiro v. Goldberg, 192 U. S. 242; Lapp v. Ryan, 23 Mo. App. 436; 2 Pom., Eq. Jur., sec. 925; Dennis v. Jones, 14 Atl. (N. J.) 913; Bassett v. Brown, 105 Mass. 551; Upton v. Tribilcock, 91 U. S. 54; Bigelow on Estoppel (5 Ed.), p. 673; Tower v. Pauley, 51 Mo. App. 75. (a) A valid rescission can be effected only by notice of intention and actual return or tender of all that has been received under the contract. Bigelow on Fraud, 4, p. 431; Rigdon v. Tralcott, 141 Ill. 649. (b) The defrauded party has but one election to rescind, which he must exercise at once, and such election is irrevocable. Bigelow on Fraud, p. 436. (c) Delay is an election to treat the contract as valid. Oakley v. Cook. 41 N. J. Eq. 350; 2 Pom., Eq. Jur., sec. 817. (d) The exercise of acts of ownership, after discovery of the fraud, must be "held to be wholly inconsistent with an election to undo the transaction and stand upon the right of rescission," and will defeat the right. Shapiro v. Goldberg, 192 U. S. 242; Lapp v. Ryan, 23 Mo. App. 436; Bassett v. Brown, 105 Mass. 557; 2 Pom., Eq. Jur.; Story on Sales, sec. 420, 446; 2 Kent's Com. (6 Ed.), 613.

*John A. Blevins* and *Henry E. Haas* for respondent.

(1) (a) Appellants did not make any objection, or save any exception, to the action of the court in submitting issues to the jury. If there was any irregularity in the manner of the submission of such issues, appellants waived same by their failure to object at the trial and to except to the action of the court in that behalf. (b) Under the statute, the court had the right to take the opinion of a jury upon any issue involved in the case, and the manner of making up such issue was within the discretion of the trial court. The

issues were properly submitted to the jury for their opinion, and the matter complained of by appellants, if there is any basis for such complaint at all, is, at most, a mere irregularity, which does not affect the merits of the controversy and should be disregarded. (2) The respondent, upon the discovery of the fraud practiced upon him, promptly notified the appellants of his intention to rescind, and offered to return to appellants the consideration received by him. They refused to rescind, and within a few days thereafter respondent filed suit for a rescission. He was not guilty of negligence in not discovering the fraud sooner, nor did he assent to, acquiesce in, or waive such fraud. Under the facts in evidence he is entitled to the equitable relief prayed for. Judd v. Walker, 215 Mo. 312; Fulkerson v. Lynn, 64 Mo. App. 653; Butler v. Prentiss, 158 N. Y. 49; St. John v. Hendrickson, 81 Ind. 352; Montgomery v. Pickering, 116 Mass. 230; Morawetz on Corporations, sec. 100; 2 Pomeroy, Equity Jur., sec. 897; Brolaski v. Carr, 127 Mo. App. 286; Cottrill v. Krum, 100 Mo. 404; Judd v. Walker, 114 Mo. App. 142; Price v. McCauley, 12 DeGex, M. & G. 339; Bigelow on Fraud, secs. 523-525. (3) Appellants formed the purpose to sell Davis their stock and consummated the deal through Forman. Browning was a party to the whole transaction, helped lay the plans, received half of the money, and is bound by Forman's acts and misrepresentations. Forman, with Browning's knowledge and consent, undertook to procure the stock for Davis from Sellner, but instead of doing so, sold Davis the stock belonging to himself and Browning, in excess of its value. The misrepresentations made by both Browning and Forman were intended by them to mislead and deceive Davis and conceal from him the fact that they were selling Davis their own stock at a price fixed by themselves. In this they succeeded, and under the evidence respondent is entitled to have the contract of sale rescinded, and a

Davis v. Forman.

decree against both appellants for the money paid out by him. Judd v. Walker, 215 Mo. 312; Sterling v. Smit, 97 Cal. 343; 2 Pomeroy, Equity, sec. 959; Montgomery v. Hundley, 205 Mo. 138; Connor v. Black, 119 Mo. 134; Conkey v. Bond, 36 N. Y. 429. (4) Forman having undertaken to act as agent for respondent in the purchase of the stock, was as much bound to act honorably without compensation as with compensation. Marshall v. Ferguson, 94 Mo. App. 183; Coalton v. Holliday, 59 Ill. 156; 2 Pomeroy's Equity, sec. 959. (5) The collection by respondent of dividends on the stock was not a ratification of the sale to him, nor did he thereby waive his right to rescind. Appellants had in their possession a large amount of money belonging to respondent, over and above that which respondent had collected as dividends, and upon a rescission of the contract they would have had to pay same over to respondent. Appellants having refused to rescind, or to return to respondent his money, respondent had the right to collect the dividends in question and hold the same as an indemnity *pro tanto*. Winter v. Cable Co., 160 Mo. 159; Pierce v. Pettus, 47 Barb. 285; Kloy v. Healy, 127 N. Y. 556; Implement Co. v. Ellis, 125 Mo. App. 696. (6) Respondent seeks a rescission of the sale of the stock to him. His suit is for a rescission. Before suit was brought he offered to rescind, and tendered back the consideration received, and in his answer and petition he again tendered back the consideration received. This is all that was required of him in a suit for a rescission. Vail v. Reynolds, 118 N. Y. 297; 24 Am. and Eng. Ency. Law, pp. 220-622; Brown v. Norman, 65 Miss. 369; Masson v. Bovet, 1 Denio 69; Paquin v. Milliken, 163 Mo. 104; Hagen v. Bank, 182 Mo. 348; Winter v. Cable Co., 160 Mo. 159; Pierce v. Pettus, 47 Barb. 285.

VALLIANT, J.—This is a suit in equity to rescind a transaction whereby the plaintiff purchased of defendants 100 shares of the capital stock of the National

Bank of Commerce of Kansas City, on the ground of fraud which plaintiff alleges was practiced on him by the defendants. In the transaction complained of the plaintiff gave his note for $31,000 which is now held by defendant Forman and on which Forman has sued the plaintiff. Plaintiff's petition specifies the alleged fraudulent acts and prays that the contract of purchase be rescinded and that defendant Forman be enjoined from prosecuting his suit on the note. The answer specifically denied all the allegations of fraud. It is not worth while to here set out the alleged fraudulent acts as stated in the pleadings, because they are the same as the plaintiff's evidence tended to prove and will sufficiently appear when we come to a consideration of the evidence.

The two suits were by agreement consolidated and tried as one. The trial resulted in a judgment in favor of Davis, the plaintiff in this suit, and also in his favor in the other suit in which he was defendant. The issues made by the pleadings were substantially the same in both suits. In the decree the court finds the issues of fact for the plaintiff, and adjudges that the contract of purchase be rescinded, that the $31,000 note be cancelled, that the plaintiff recover of the defendants the money he paid them on the purchase, and on the note for principal and interest at six per cent, amounting to $12,838.62, less the amount of dividends which plaintiff received on the stock while he held it, and interest thereon at six per cent, amounting to $4851, leaving the amount due plaintiff $7,987.62, for which he is given judgment, and to secure the same he is given a lien on the stock, which the sheriff is to sell and apply the proceeds first to the payment of the $7,987.62, to plaintiff, next to the costs, and the balance to the defendants. The decree disposes of both suits. The defendants Forman and Browning appeal.

229 Sup—3

I. Appellants' first point is that the trial court erred in a matter of practice in the manner in which it submitted the issues of fact to the jury. This is a suit in equity, and was triable by the court without a jury; even the suit on the note was converted into a suit in equity by the answer setting up an equitable cross suit and praying affimative relief in rescission of the contract and cancellation of the note. But although the cause was triable by the court, the court had the authority to take the opinion of a jury on any specific question of fact included in the issues made by the pleadings. [Sec. 692, R. S. 1899, now sec. 1969, R. S. 1909.] At the opening of the trial the plaintiff requested that the issues of fact be submitted to a jury, and the court ordered that a jury come, thereupon came a jury "duly selected, tried and sworn well and truly to try the issues herein joined and a true verdict render in accordance with law and the evidence." The jury heard all the evidence, but the issues to be submitted to them were not framed until the close of the evidence; then the court framed two issues which practically covered the whole case and submitted them to the jury to answer, yes or no, as they might find the facts from the evidence. The verdict of the jury was in favor of the plaintiff on both issues. It was not a unanimous verdict, ten only concurred therein. In the decree the fact of the submission of the issues to the jury and the answers of the jury to the questions submitted are recited, but the court goes on to make its own findings of the facts and bases its judgment on its own findings.

The record shows that the defendants objected in the beginning to the submission of the issues to a jury, yet they did not except to the ruling of the court ordering a jury, and they made no objection to the trial proceeding in the presence of the jury before the issues were framed. In open court it was stipulated in writing that: "If any of the issues in either

or both of said causes be submitted to a jury, all other issues, if any, in either of said cases may be heard and determined by the court at the same time and upon the same evidence.'' Thus it was stipulated that whilst the evidence bearing on the issues that might be submitted to the jury was being heard, the court at the same time was to hear all the evidence on all the issues. Appellants now say it was error to have waited until the evidence was all in before framing the special issues to be submitted to the jury. Appellants' theory is doubtless derived from the ancient chancery practice which in this particular was more dilatory and cumbersome than the modern practice under the code. [2 Daniell's Ch. Pl. and Pr. (6 Ed.), *1071.] Our statute confers on the court trying an equity cause authority to take the opinion of a jury on any issue of fact involved, but it does not prescribe when the issues to be submitted to a jury are to be framed, whether before or after the evidence is heard, but leaves that matter to the discretion of the chancellor. It is very good practice to have the jury present from the beginning to the end, so that they may hear all the evidence. And after the evidence is all in, the court is usually better prepared to select the issues on which it desires the opinion of the jury than it would have been before it had heard the evidence. Although a jury may have been impaneled and sworn and present during the hearing of all the evidence, yet if at the end the chancellor concludes that he does not care to have their opinion, he doubtless may dismiss them without submitting any issue to them. After all, the verdict of the jury in such a case is merely advisory. [Bronson v. Wanzer, 86 Mo. 408; Keithley v. Keithley, 85 Mo. 217.] It has been held that the verdict of a jury in such case is not a subject for examination on an appeal. [Weeks v. Senden, 54 Mo. 129.] The taking of the opinion of a jury is a matter so entirely in the discretion of the chancellor that no

error can be predicated on the fact that he did not frame the issues to be submitted to them until they had heard all the evidence.

It is also insisted by appellants that the constitutional amendment allowing nine of a jury "in a civil action" to render a verdict does not apply to a case of this kind. Whilst in legal nomenclature it is more accurate to say "suit in equity" and "action at law," yet under our Code of Civil Procedure, which was in force long before the constitutional amendment referred to was adopted, it is declared: "There shall be in this State but one form of action for the enforcement or protection of private rights, and redress or prevention of private wrongs, which shall be denominated a civil action." The provision of the constitutional amendment applies therefore as well to a jury called by a chancellor as to one in the trial of an action at law.

II. This transaction occurred in St. Louis in September, 1902. At that time defendant Forman was president of the Fourth National Bank of St. Louis and Browning was a director in the bank. Davis was a customer of the bank, that is, a depositor, having at that date about $10,000 on deposit. Davis and Browning boarded at the same hotel, a pleasant social acquaintance sprang up between them, visits and social pleasures were exchanged between them and their wives. Forman occasionally visited Browning at the hotel, and on one of his visits he was introduced by Browning to Davis. Plaintiff's testimony tended to prove that it was at the solicitation or suggestion of Browning that he became a depositor in the Fourth National Bank, in June, 1902. Plaintiff as a witness in his own behalf testified as follows: "Q. State to the jury what conversation, if any, you had with Mr. Browning prior to the 11th of September, 1902, relative to the purchase by you of stock in the National

Bank of Commerce in Kansas City? A. Mr. Browning told me that he and Mr. Forman owned some of the stock of the National Bank of Commerce in Kansas City, that they regarded it very highly as an investment, and in fact, had none of their stock for sale, but he suggested that if I wanted to make a good investment he would recommend the National Bank of Commerce of Kansas City; in his opinion that it was worth four hundred dollars a share, although it might be bought for less. The reason that he thought it was worth four hundred dollars a share was that Mr. Forman had been national bank examiner, and told me that in his capacity as national bank examiner they had great hidden assets. I think a million dollars, that was not disclosed in their statement—a million dollars hidden assets not disclosed in their printed statement, and suggested my buying some of the stock. I then asked him 'where the stock could be bought, as I had never bought any bank stock in my life. He said it, was very difficult to obtain, in fact, there were very few transactions made in the National Bank of Commerce. That he and Forman had some stock, but it was pooled, and that they had a profit at that time, I think he said, of ten thousand dollars, and that they thought very highly of the stock and would not part with any of their holdings at all. I then said, How am I to get any of the stock, if you do not know where it can be bought? Well, he said, there is an old German down here in South St. Louis that occasionally comes in the bank and we have been trying to buy his one hundred shares of stock for some time, but have failed to buy it by reason of the price asked. Now, he said, it might be possible Mr. Forman could buy that hundred shares of stock for you. He said, I would suggest your seeing Mr. Forman, drop in there in the course of two or three days and have a talk with Mr. Forman about buying these one hundred shares of stock belonging to the old Dutchman—he did not

mention any name—in South St. Louis. In the course of two or three days, at the solicitation of Mr. Browning, I called on Mr. Forman, told him that Mr. Browning had sent me down to talk with him with reference to one hundred shares of stock owned by this old Dutchman. Mr. Forman said, 'Yes, there is an old fellow down here by the name of Sellner that has got one hundred shares of that stock, but I don't know whether I can buy it or not. I will see him and see what I can do for you.' He said, 'I think it is a good investment, Davis, and if you can buy it I would urge you to take it.' I said, 'All right, suppose you see this man.' In the course of a couple of days he rang me up in my office and asked me to call down to the bank. I called at the bank. He said, 'I have seen Mr. Sellner, and he wants three hundred and sixty dollars a share for that stock. Now, Davis, that stock, in my opinion, is worth four hundred dollars a share. I was national bank examiner and examined that bank on several occasions, and I know what I am talking about, and I would urge you to buy that stock as an investment;' and I said, 'Is that as low as it can be bought?' He said, 'Sellner will not sell for less than three hundred and sixty dollars a share.' I said, 'Mr. Forman, if you think it is a good investment I will be guided by your judgment in this matter; you go ahead and buy these hundred shares of stock as cheaply as you can.' He said all right.

"Q. What if anything, did Mr. Forman say to you about his own stock? A. He told me that he and Browning owned stock in it, but none of their stock was for sale. If he told me that once he told me that twenty times. Q. Said what? A. If he told me that once he told me twenty times that their stock was not for sale. Q. Proceed. What was done after you told him to buy that stock as cheaply as he could? A. Two days afterwards he called me up over the 'phone in my office and asked me to come to his office. I went there.

He says, 'Mr. Davis, I bought that stock for you and had to pay three hundred and sixty dollars a share for it.' "

Continuing, the witness said: "He said,' 'I sent the certificate over to Kansas City and had it made out in your name and here it is now, you indorse it in blanks here;' and I said, 'How much margin— what deposit do you want here on this?' and he sug-. gested five thousand dollars, I gave him my check for five thousand dollars, and the matter was closed so far as the purchase of the stock was concerned. . . . He drew up a note for $31,000 payable to the Fourth National Bank, which I signed. At the end of thirty days I paid off $1000 leaving an even $30,000."

The stock was left with Mr. Forman, president of the bank, as collateral security. Witness went on to say that a few weeks after the transaction he noticed in a Kansas City paper that the stock was quoted at three hundred and thirty-five or three hundred and forty dollars, and he called Mr. Forman's attention to that fact, whereupon Forman said the quotation was only nominal, that it was down now, but would go up again; that he was in constant communication with the president of that bank, who did not make a move without advising him; that they were going to raise the dividend from twelve per cent, as it was then, to sixteen per cent, and were going to double the capital stock. Witness did not learn until August, 1905, that the stock he bought was owned by the defendants, although he in the meantime met Mr. Forman frequently, probably once or twice a week; during all that time Forman kept on saying that the stock was a most excellent thing to keep, and that none of his own stock was for sale. In August, 1905, after he had heard that it was their own stock that defendants had sold him, witness called on Mr. Forman at the bank. "I said, Mr. Forman, I am not altogether satisfied about that National Bank of Commerce stock in Kansas City,

whose stock was it that I bought? He was very much embarrassed indeed and for a second did not say anything; finally he said that was your friend Browning's stock. 'I understood you to say it was Sellner's stock down here.' 'O well,' he says, 'I did have to see Sellner about it.' Well that is about all that was said then. I then called on Mr. Browning a very few minutes afterwards, taking a gentleman friend along with me (Mr. Woodward) and asked Mr. Browning in his office the same question. I said, 'Browning, whose stock was that Forman sold me, that National Bank of Commerce stock?' 'Well now,' he says, 'I don't know.' 'Why,' I said, 'I understood Forman to say it was Sellner's stock, old man Sellner's stock.' He said, 'Well now, I will tell you Davis, it was either old man Sellner's stock, or else it was Dave Sommers's mother-in-law; they were both selling stock about that time.' " Mr. Woodward testified substantially to the same effect in regard to this conversation with Mr. Browning. The plaintiff further testified that soon after he returned to his office Mr. Browning called him over the telephone saying he wanted to see him, but plaintiff answered that he did not care to see Mr. Browning except in the presence of his (plaintiff's) attorney. In a few minutes Mr. Browning called at plaintiff's office saying that he had called to talk with him personally about the matter, but plaintiff refused to talk until he could have the presence of his attorney, whom he then called over the telephone. When the attorney appeared (according to plaintiff's testimony) plaintiff stated the whole transaction to Mr. Browning substantially as he had just testified, to which Mr. Browning replied that he would not say but what that was the truth, but he said that he did not want any trouble and if a few hundred dollars would cut any figure he was prepared to offer. "I think he said eight hundred dollars." On objection of defendants that testimony was ruled out as relating to a proposed compromise. Witness

was then asked: "Q. What did he say, Mr. Davis, if anything, about as to whose stock you got? A. He said I came over to tell you the truth about that transaction; that stock belonged to me and Mr. Forman; it was in Mr. Forman's name, but half the stock was mine and the other half was. Mr. Forman's." Plaintiff's attorney was a witness and testified to certain conversations he had with the defendants after the matter had been placed in his hands, relating to his own acts as counsel; when asked to state what was said at the meeting above mentioned between the plaintiff and Mr. Browning at the plaintiff's office, he said being counsel in the case he preferred not to be witness also except in reference to his own interviews with the defendants, and would therefore prefer not to testify as to what occurred at that interview unless counsel for defendants would ask him for his testimony on that point, but they did not ask him about that. He testified that before bringing this suit he went to the office of Mr. Forman and tendered him $3600, which was the amount of dividends plaintiff had received on the stock up to that time, and tendered also the certificate of stock, that is, the certificate of stock being already in Mr. Forman's hands as collateral to the note, the attorney authorized him to keep it and demanded payment of the amount plaintiff had paid him for the stock and interest, all of which Mr. Forman refused.

The testimony for the plaintiff as to the value of the stock was to the effect that at the date of the purchase its value in the market was not more than $350, although in July previous it had reached a point when some was sold for $360, but since July it had declined and had continued to decline, with some fluctuations, from the date of the sale, September 11, 1902, to the present time; it was not listed in the Stock Exchange of St. Louis and there was no Stock Exchange

in Kansas City, but its market value was better known there than in St. Louis.

At the date of this transaction the defendants owned 205 shares of this stock of which 100 shares were sold to the plaintiff as above stated and about the same time they sold the remaining 105 shares to a Mr. Traverse at the same price and under circumstances (according to testimony on the part of plaintiff) very like those under which the sale to plaintiff was made, except that Forman told Traverse that it was Browning's stock, that he, Forman, had such stock, but would not sell it, because it was worth more money than Browning was asking. He repeated to Traverse the same story about the hidden resources of the bank.

Defendants testified in their own behalf and each denied the allegations of fraud.

Mr. Browning's account of the transaction was substantially as follows: Mr. Davis and witness boarded at the same hotel and a pleasant hotel acquaintance grew up, no intimacy, no particular friendship, just pleasant acquaintanceship. Mr. Forman and witness had been friends for years and he used to call at the hotel to visit witness; Mr. Davis observing this, expressed a wish to form the acquaintance of Mr. Forman; accordingly on one of Mr. Forman's visits to the hotel witness introduced the two gentlemen. Shortly after that Mr. Davis asked witness if he and Mr. Forman did not buy stocks, and asked what stocks he had; witness said, "I own some preferred stock of the Ely & Walker Dry Goods Company and also some common stock of the same company; Mr. Forman and I jointly own some stock in the National Bank of Commerce of Kansas City." He denied that he told Mr. Davis that the stock was in a pool; he said he expressed his opinion that the Ely-Walker stock would go up to $140 and $200, and would not be surprised if the National Bank of Commerce stock would go to $400 a share, because, in the opinion of Mr. Forman, the president

of the bank expected to increase the capital stock from one million to two million dollars and the new issue would sell for $200, which would be equal to $400 per share of the old; that the bank had deposits to the amount of $30,000,000; he told Davis that none of his stocks were for sale; he did not tell Davis that there was an old German named Sellner who had some stock that he thought he might buy, never called Sellner's name, never knew that Sellner had any stock. Davis said he would like to see Mr. Forman and talk with him about investments; "I said,'Go and see Mr. Forman.' I made no suggestion as to what kind of stock I thought he ought to buy. I did not advise him to buy any stock." Afterwards on account of illness witness concluded to sell this stock, but Forman did not want to sell. Pending a consideration of the subject witness and Forman went to Kansas City to see the president of the bank and get his consent to the sale of their stock, not that it was necessary, but because that bank was a valuable customer of the Fourth National Bank and Forman wanted to keep on good terms with its president. They went to Kansas City, spent a day there, and returned; on the train coming home they decided to sell the stock, that was the first time the stock was for sale. The stock, although owned by them jointly and equally, stood in the name of Forman alone. This witness's account of the conversation in his office between himself and Davis when Woodward was present was substantially as those two had stated except that instead of saying in answer to Davis's question that the stock either belonged to Sellner or to Dave Sommers's mother-in-law, he said: "I said it might have belonged to Sellner or might have belonged to Dave Sommers's mother-in-law. I want to tell you why I said that. Q. Well? A. I had an understanding in a general way that the stock which Mr. Davis bought belonged to Mr. Forman and me, and we were to divide the profits, but I knew nothing

about the transfer of the certificate, and I knew that the certificates belonged to Mr. Forman and me. We deposited it in different places in country banks as collateral, and I did not feel disposed to dispute Mr. Davis's assertion that it belonged to Mr. Sellner. I did not know Sellner. I did not know whether he had or had not stock in the bank, and I thought possibly that Mr. Forman might have borrowed a certificate from Mr. Sellner or Sommers's mother-in-law or Mr. Ferguson. Mr. Ferguson, I understood, had some stock, or Mr. Gertz, and I though possibly he might have borrowed their certificate.''

And the witness's account of the conversation between himself and Davis in the latter's office afterwards on the same day when the attorney was present is substantially as stated by the plaintiff except that instead of saying ''I have come to tell you the truth about it,'' he said ''I have come to tell you the exact situation.''

Mr. Forman's testimony was to the effect as follows: ''He denied that there was any conspiracy or secret understanding between him and Mr. Browning to sell their stock to the plaintiff under the pretense that it belonged to Sellner or anyone else. His account of the transaction was that Davis came to him one day and in a casual way said he would like to make some investment if witness knew something good. He said, 'I understand you and Mr. Browning own some Bank of Commerce stock?' I said, 'We do.' 'Well,' he said, do you know where I could buy any?' I said, 'None of my stock has been offered for sale. I do not know of any for sale,' and I took no interest further than to say I thought it was a good investment and the matter was dropped at that time.'' Another time Mr. Davis came into the bank and asked witness about the value of the stock. ''I said to Mr. Davis that I had not examined that bank for three or more years. I know nothing of its financial condition of my own knowledge

in my capacity as national bank examiner, but I did have information to the effect that there was considerable concealed profits, what it amounted to I could not say, only from hearsay. . . . . I said they had Government bonds at par when everybody knew they were at a premium, and also stated that I had information that I considered reliable that they were carrying other stocks and bonds at much less figure than they were actually worth, but what amount I could not say." A third time Mr. Davis came and again said he wanted some of that stock, and "I said, 'Mr. Davis, I never offered any of my stock for sale and don't know you could purchase it'." Shortly after that Mr. Browning suggested to witness the idea of selling a portion of their holdings, and in a few days they went to Kansas City together and spent one day there; witness went on his own business, and did not know what Browning's business was, did not see him during the day. Witness went to the bank in Kansas City and talked with the president about selling his stock, said he did not want to sell, but yielded to Browning's importunities. After they came back from Kansas City witness called Davis over the telephone and told him if he still wanted to buy some of the bank stock he could sell him 100 shares for $360 a share, and Davis said he would take it; when Davis came down to the bank the transaction was completed. Witness had sent the old certificate to Kansas City and had it canceled and a new certificate made out in Davis's name, and when Davis called to close the purchase he asked how much margin was wanted; witness said, $5000, for which amount Davis gave his check, and his demand note for $31,000 payable to the Fourth National Bank with the stock as security; the bank cashed the note and the money was divided between witness and Browning. The certificate of stock in Davis's name was shown him, with the request, "Sign here", which was for an indorsement or assignment in blank, Davis signed and

passed the certificate back to witness. That ended the transaction and witness heard no more of it until in August, 1905, when this trouble arose. When the attorney for plaintiff called on witness and made the tender and demanded a rescission, witness was indignant and denounced it a scheme to blackmail. Within a few days thereafter witness took up the note from the bank and brought suit on it.

There is a slight discrepancy between the testimony of Mr. Browning and that of Mr. Forman as to the object of their visit to Kansas City; Mr. Browning testified that they both went on the business of selling this stock; Mr. Forman testified that he went on his own business, but did not know for what purpose Mr. Browning went. But they both agreed that their conclusion to sell the stock was reached on that trip.

The testimony is quite voluminous, covering 200 printed pages, but the above statement condenses what we consider the most material parts on both sides.

III. When, as in this case, the trial is before the chancellor on oral testimony, he sees and hears the witnesses, those interested and those uninterested, observes the manner and the tone of each witness, the manner of conducting the examination and of presenting the case to the court, and all the living effects of the trial, he is better prepared to pronounce judgment on the weight of the evidence than is an appellate court who sees the case only in light of the cold record. We have gone over all this record and are satisfied to leave the facts as the chancellor found them.

IV. Appellants contend that respondent, having delayed three years to repudiate or rescind, is now barred from any right to sue in equity on the alleged fraud, and they cite cases which show that under the facts of those cases the plaintiff had acquiesced too long to be heard at last to complain. But those cases show that there were facts or circumstances to put the

party on inquiry and that inquiry would have led to discovery. In their argument counsel for appellants treat this case as if the fraud complained of consisted in the fact that defendants misrepresented to plaintiff the value of the stock and sold it to him at a price higher than it was worth. If that were all the plaintiff had to complain of the argument would be sound, because after he became the holder of the stock he could have discovered by ordinary care that it was not worth what he had paid for it; in fact, he did notice in a Kansas City newspaper a few weeks after his purchase that the stock was quoted at $340 and spoke to Mr. Forman about it, and Forman reassured him. If the transaction had been fair otherwise, he would have had no right to complain that he paid more for it than it was worth. Value of such a commodity is to a great extent a mere matter of opinion, and unless there is some fact or circumstance making a misrepresentation, by the seller to the buyer, concerning the value, a fraud, it will ordinarily not be so regarded in law. But when the seller purports to give his opinion, knowing the buyer relies on it, and at the same time conceals from the buyer a fact which he knows would cause the buyer to distrust or to place less confidence in the opinion given, the law does condemn the act and will relieve against it. In this case the plaintiff is not complaining merely of the fact that the defendants misrepresented the value of the stock, but the gravamen of the complaint is that they fraudulently concealed from him the fact that would cause him to distrust their statements in regard to the value. If the plaintiff's testimony is true he knew nothing of the value of the stock except what the defendants told him and they knew that he was trusting them because he believed that they were disinterested. They said to the plaintiff (if his story is true): We own stock in that bank but it is not for sale; we will not sell our stock because we have private information that causes us to believe

that the stock will advance to $400 a share; Mr. Forman while he was United States bank examiner discovered that that bank held a large quantity of undisclosed assets, and he has kept in close communication with the president and knows his purpose to increase the capital stock from one million to two million dollars. Thus leading the plaintiff to believe that he was getting information that was not attainable by the public and inducing him to part with his money to purchase their stock at a price which was at that time at least ten dollars a share higher than they could otherwise have sold it, higher than it had ever been except in the preceding month of June, and higher than it has ever been since. There was nothing to put the plaintiff on inquiry as to the ownership of the stock; he had no notice to cause him to doubt that it belonged to Sellner, and under the circumstances he had a right to believe that if the defendants had made a mistake in their estimate of the value, present or prospective, it was an honest mistake and would result as much in their disappointment as his own. In August plaintiff obtained information that led him to suspect that defendants had sold him their own stock and he immediately went to them to inquire as to the facts and these suits were started in a few days thereafter. Plaintiff can not therefore be condemned for waiting too long to appeal to the court for a rescission.

But if defendants were guilty of the misrepresentations or concealments charged they are in no position to complain of the plaintiff for having too long trusted in the truth of their statements. The following quotation from Morawetz on Corporations, sec. 100, cited in respondent's brief, very clearly states the law: "Hence, it was said by the Lord Chancellor (Chelmsford), in the House of Lords, 'It appears to me that when once it is established that there has been any fraudulent misrepresentations or willful concealment by which a person has been induced to enter into a

contract, it is no answer to his claim to be relieved from it, to tell him that he might have known the truth by proper inquiry. He had a right to retort upon his objector, 'You at least, who have stated what is untrue, or have concealed the truth, for the purpose of drawing me into a contract, cannot accuse me of want of caution, because I relied implicitly upon your fair-ness and honesty.' " To the same effect also is 2 Pomeroy Eq. Jur., sec. 897. The doctrine is also fully expounded in Judd v. Walker, 215 Mo. 312.

V. Plaintiff collected dividends on the stock dur-ing the three years that he held it before discovering the alleged fraud, and when he did make the discovery he tendered the amount, together with the certificate of stock, to defendant Forman, and demanded rescis-sion, which defendant refused, and the suits followed within a few days. After the suits were filed he col-lected two more dividends and these he stated at the trial he held subject to the order of the defendants on a rescission of the contract. The decree in the case covers those dividends and credits them to the defend-ants in the accounting. The plaintiff is not estopped by that conduct. After he had tendered the dividends and the certificate and demanded a rescission and had been refused, he was justified in collecting the further dividends and holding them at the disposal of the court.

VI. Appellants contend that the transaction as stated by Mr. Davis is so improbable that it is unbeliev-able. If Davis's story were as appellants' counsel un-derstand it to be, it would sound very improbable, but we do not so understand it. According to the under-standing of appellants' counsel the case Davis makes is this: Davis, acting on his own suggestion, ap-proaches Forman and engages him as his agent to pur-chase for him 100 shares of stock at $360 a share, which involves an outlay on the agent's part of $36,000,

for which the agent is to have no compensation, and as to all of which Browning has no knowledge or information. The idea is that the mere fact that Davis was not called on to put up the $36,000 to be used in the purchase, showed that he could not have understood that Forman was to buy the stock from a third person. That view overlooks other influential facts. Davis was a depositor in the bank with $10,000 to his credit; the stock, even if it was not worth what he agreed to pay for it, was undoubtedly good collateral for at least $30,000, as the action of defendant Forman shows; for he, as president of the bank, named the margin required, and took the stock for the bank as collateral for $31,000; his loyalty to his bank cannot be questioned. The bank was in business to lend money on good security at a fair rate of interest. This was not a transaction between two individuals entirely dissevered from their business relations, but was to be conducted in the bank of which one was the president and the other a customer. It is not, therefore, unbelievable that the parties had it in mind to close it as it was closed, by the payment of as much money as the president of the bank thought necessary to ask and the bank making a good loan. Mr. Forman testified that it was his own proposition to lend $31,000 on the stock as collateral.

The fact that defendant Forman so managed the business as that the original certificates which stood in his name did not come under the eye of the plaintiff Davis, but were sent to Kansas City and a new certificate issued in Davis's name, is a fact concerning which said defendant while testifying thought some explanation was due. His explanation was that in case a dividend should fall due immediately it was liable to be paid to the party in whose name the stock had stood, "and I knew if Mr. Davis was a business man he would not accept the certificate. I told him and I suggested that I would send it to Kansas City

for transfer, and he assented and I had it done.'' Why should Mr. Forman fear that Mr. Davis would refuse to accept a transfer of the old certificate lest, between the transfer of it to him and his sending it to Kansas City to be transferred, a dividend might suddenly fall due and it be paid over to the original holder, when Mr. Forman was himself the original holder! When we reflect that it is but one night's journey by mail to Kansas City from St. Louis the reason given does not seem sound; but if Mr. Davis had objected to taking a transfer of the original certificate lest a sudden dividend be declared and be paid over to the original holder before notice of the transfer could reach the bank, the objection could have easily been overcome by Mr. Forman's disclosing the fact that he was the owner of the stock; the relations between the parties were then on such a footing that all fear would then have been allayed. If, however, the object was to keep Davis from knowing whose stock it was he was buying the course pursued was reasonable.

VII. It is contended that as to Forman, he being a mere gratuitous agent, if he is liable at all, it is for misfeasance as agent and the plaintiff's remedy is at law. And as to Browning, since he knew nothing of the transaction between Davis and Forman, he is not liable at all. Those contentions rest on the understanding the learned counsel for appellants have of the facts as stated in the foregoing paragraph, but which understanding as we have pointed out comprehends but a partial view of the facts, overlooking the most important ones.

VIII. Appellants say that if it be conceded that the defendants made false representations to the plaintiff the misrepresentations were of a totally immaterial fact, that it was immaterial whose stock it was which Davis bought, and the representations as to its value were immaterial. The argument is that Davis wanted

the stock and he bought stock of the kind he wanted, it was worth as much to him if he had bought it from one person as from another, his gain or loss was the same whether it was Sellner's stock or that of the defendants. Again the appellants take a restricted view of the evidence and overlook all of it that goes to show that Davis had a right to rely on the statements of these defendants as to the value of the stock. But we have already discussed that feature of the case. The fact that this was not Sellner's stock might, under other circumstances, be immaterial, yet under the circumstances of this case it is material.

We find no error in the record. The judgment is affirmed. All concur.