WILLIAM H. ENSLER v. MISSOURI PACIFIC RAILROAD COMPANY, Appellant.—23 S. W. (2d) 1034.

Division One, February 3, 1930.

*Thos. J. Cole, Arnot L. Sheppard* and *J. C. Sheppard* for appellant.

*C. O. Inman* and *W. H. Douglass* for respondent.

RAGLAND, J.—This is a suit under the Employer's Liability Act in which plaintiff seeks to recover damages for personal injuries caused, as it is alleged, by defendant's negligence. At the time he received his injuries plaintiff was in the employ of defendant at Bismarck, Missouri, as a roundhouse foreman. His duties as such foreman were to inspect, and to repair or cause to be repaired, when in need of repairs, the engines coming into such roundhouse, if such repairs could be made with the material, tools and appliances furnished by defendant for that purpose at Bismarck: as to cases in which required repairs could not be made at Bismarck it was plaintiff's duty to notify one Reinhardt, defendant's master mechanic at Poplar Bluff, Missouri.

In the early morning of December 28, 1924, while it was still dark, plaintiff climbed up on one of defendant's engines which was standing just outside of the roundhouse for the purpose of making an in-

spection.  As he was leaving the cab and coming down the step for
the purpose of getting down off the engine, he slipped and fell to the
ground, falling on his back across one of the rails of an adjoining
track and thereby sustaining the injuries for which he sues.  He al-
leges in his petition, and his evidence tends to show, that his fall was
caused by certain defects in the engine and its tender, namely: (1)
the floor of the tender was lower than that of the cab, causing the
iron plate or apron which afforded the walk-way between the engine
and the tender to tilt or lie on an incline; (2) the plate was smooth,
whereas such a plate ordinarily has a roughened surface; and (3)
a leaky arch tube of the boiler in the engine permitted steam to
escape which condensed and froze on the plate, giving it an icy sur-
face.  The defects just mentioned had existed for sometime, at least
three or four weeks, before plaintiff received his injury, according
to his testimony.  He stated that they were of such character that
they could not be remedied at Bismarck and that he had reported
them, verbally and by letter, to Reinhardt.  When confronted with
his reports of repairs on the engine in question, of dates December
5th, 9th and 23rd, respectively, made by him to the master mechanic
on specially prepared forms furnished by defendant and in which
none of the defects now complained of was mentioned, plaintiff of-
fered a two-fold explanation: He said: first, that the reports were
prepared by men under him who did the work of inspecting and re-
pairing, he merely endorsing his approval on them, and they (the
men making the inspections and repairs) could have overlooked the
defects in question; and, second, that they were not supposed to
"find everything on those engines," that some things were omitted
"to keep them from the Government man."  His counsel had served
notice on defendant to produce at the trial the letters he claims to
have written Reinhardt with reference to the condition of the plat-
form apron and the leaky arch tube of the boiler; Reinhardt denied
receiving such letters, and of course did not produce any; he further
denied having received notice or knowledge of any kind or from
any source of the conditions just mentioned prior to plaintiff's in-
jury.

Following his injury plaintiff was confined to his home until about
January 17th, at which time he resumed his duties as roundhouse
foreman.  About a week thereafter his physical condition became
such that he was unable to continue at work.  He then went, or was
sent by one of defendant's physicians, to a hospital in St. Louis.  He
remained in the hospital, except during short intervals, until May
12, 1925.  At that time he was unable to work and so continued up
to the time of the trial, March, 1927.

On July 13, 1925, plaintiff received from defendant $2300, and
at that time executed a paper which recited that said sum was paid

and received in full settlement of all claims growing out of the injuries for which plaintiff now sues. His signature was witnessed by his wife. The release was pleaded in bar by defendant. Plaintiff replied by charging that it was obtained through the false and fraudulent representations made by Kendall, defendant's claim agent. The testimony of plaintiff as to the circumstances under which the paper was signed, omitting repetitions, was as follows:

"I told Mr. Kendall that I couldn't see it and he pointed his finger to show me where to sign my name. My eyes were so I couldn't read then.

"Well, your wife was there—she could read, couldn't she? A. She could read, but wasn't there; she said she was going to town and I suppose she went. Q. Isn't that her signature on that release or receipt, as witness (indicating on exhibit)? A. She came in after I had signed it and Mr. Kendall asked her to sign it. I didn't ask her to read it over to me because she wasn't in there when I signed it. I suppose she had gone to town. It wasn't read to me. . . .

"I was in bed. It was on July 13, 1925, in my home in Bismarck, in the front bedroom. I think he was at the house four times and he was at the hospital to see me about three times. He was always friendly with me, posed to be my friend. . . . Sure, I thought he was my friend. . . .

"He rapped at the door and Mrs. Ensler let him in and he asked her where I was and she says, 'In the bedroom,' and he came in and put his hand on my head and says, 'Well, how are you?' and I says, 'Mr. Kendall, I'm pretty near crazy with pain' and he says, 'It's too bad.' I told him to sit down and he sat down and he started telling me what the company thought of me, because I had been such a good man with the company, and the company was going to pay me my time until I got ready to go to work and all doctor expenses. And he sat and talked to me and praised me up, and he said he didn't think Mr. Reinhardt thought anything of me, and when I got ready to go to work he would fix it up with Mr. ———— in St. Louis for me to go to work there, and we talked a little while, and he says, 'Well, what do you think you ought to have?' 'I saw doctors in St. Louis and they tell me the same as you did, that you will be down a year or longer.' And I says, 'Mr. Kendall, I ought to have my wages.' He says, 'I promise you your wages, and I have talked to the claim department and they don't think you ought to have your full wages, but I've talked them into giving you full time for six months and now how about that?' I said, 'Mr. Kendall, all I want is what is right.' He said, 'If you are satisfied, I will pay you now for a year and whenever you get ready to go to work, we will take care of you, because you have done right with the

company.' 'Well,' I said, 'Mr. Kendall, the money right now, the way I need it, will do me a whole lot of good.' He says, 'If you are satisfied, I'll pay you for the year and if you go to work before a year, if you get well in nine months, you will have your full time.' So he sat down and figured it up, I told him how many days I had been working, and he figured it all up and he told me what it came to, and I says, 'I don't know, Mr. Kendall, I'm in too bad shape to figure. I'll have to leave it to you.' And he got these papers out and fixed them all up and he came over to my bed and laid them down on my breast and says, 'You will have to sign the receipt, Will, before I can give you a check.' I says, 'Mr. Kendall, I can't see it; I've had so much pain I can't see it,' and he says, 'Oh, its just a receipt,' and I says, 'I can't see where to sign it' and he showed me with his finger where to sign it and I signed it with his own pen, and he then sat down over in the corner. He said if I were not able to go to work after the year had expired, they would continue to pay me, and said they would make a settlement later on when I get ready to go to work. . . .

"In this conversation of July 13th, nothing was said about this being a final settlement for my injuries; he just asked me to give him a receipt for my wages, and I surely believed Mr. Kendall when I thought it was just a receipt for my wages. . . .

"I didn't figure up what my wages would be for six months full time and six months half time. Mr. Kendall did all the figuring himself, but I knew it would be around something like that. I wouldn't have signed this paper if I had thought it was a release. I had worked six or seven or eight days during the year, 1925, and the company had given me a check for that while I was in the hospital, the Mrs. got it."

Kendall, the claim agent, testified:

"There had never been any discussion or question but that he was settling for his injuries—wages did come into the discussion in arriving at some amount to pay him, but there wasn't any information on my part that he was simply being paid his wages. As stated, we arrived at a settlement. Mr. Ensler, as I remember it, wanted maybe $1,000 more than we paid him, and our department didn't want to pay as much as I finally paid him. We finally arrived at a conclusion, however. Mr. Ensler had been approached by attorneys who wanted to have him sue the company and he didn't want to. When we had arrived at an amount that was satisfactory to both of us, he signed the release that I made out. Whether Mr. Ensler read it or I read it to him, I don't remember, but one or the other was done. But, that is always done when I make a settlement, either read it to them or have them read it."

On June 28, 1926, the plaintiff wrote to Mr. J. H. Amos, the head of the defendant's claim department in St. Louis, the following letter:

"Dear Sir:

On December 28, 1924, I was injured at Bismarck and the hospital doctors said it would take 1 year for the injuries to get well. Mr. S. T. Kendall of the staff of your adjusters offered me full time for 1st 6 month and ½ time for the 2nd six months and I accepted but it has taken longer but I am thankful I am O. K. again 5ft 7 in. & weigh 145. I want to ask Mr. Fetner for another job as a foreman but before I do I wish to know if your department has any objections to me going to work. I know Mr. Kendall hasn't for he knows how I have protected the Co in the injury cases on the Mo. Pac. at Poplar Bluff also at Bismarck. Wish to hear from you in regards to this and any time I can be of any service to your Co whether I am in your employ or not, Just write me."

The trial court overruled a demurrer to the evidence asked by defendant at the close of the case and submitted the case to the jury. A verdict was returned for plaintiff assessing his damages at $33,000. The judgment entered thereon was followed in due course by this appeal on the part of defendant.

The errors assigned are the refusal of the defendant's demurrer to the evidence and the giving at plaintiff's instance of an instruction designated as Number 5.

In support of its contention that defendant's demurrer to the evidence should have been given, appellant insists that the evidence conclusively shows that plaintiff's injuries were caused by his own negligence: that it was admittedly the duty of plaintiff to have made timely discovery of the defects which he says caused his injuries and to have repaired them, if he could with the means at hand, and if not to have notified the master mechanic of their existence; he did not repair them, and there is no substantial evidence that he gave the master mechanic the required notice. It is true that in three regular formal reports, relating to the particular engine in question, made in the month of December just prior to his injury, plaintiff made no mention of the defects to which he attributes his injury, yet he swore positively that in letters, and in conversation, though he does not say when or where it was had, he made known to Reinhardt the existence of the defects. It cannot be said that his testimony does not constitute substantial evidence: its credibility was for the jury.

As a further reason why the defendant's demurrer to the evidence should have been given, appellant urges that the evidence was insufficient to take to the jury the issue of whether the release was fraudulently obtained. Instruction Number 5 was given in connec-

tion with the submission of that issue and as it is claimed to be erroneous both questions will be taken together. The instruction was as follows:

"The court instructs the jury that if you find and believe from the evidence that at the time plaintiff signed the paper claimed by defendant to be a release of plaintiff's claim, plaintiff was unable to read same on account of the condition of his eyes, and that the claim agent represented to plaintiff that the paper in evidence and signed by plaintiff was for plaintiff's wages, then under these circumstances the plaintiff had a right to rely upon the representations of the claim agent that he (plaintiff) was only signing a receipt for his wages for the year 1925, if you find such representations were made by the claim agent, and find these to be the facts, then the paper purporting to be a release is not binding on plaintiff, and in arriving at your verdict you will disregard the purported release."

A person who is *sui juris* and who intentionally signs a paper is, in the absence of fraud or mistake, conclusively presumed to know its contents. [Crim v. Crim, 162 Mo. 544, 552, 63 S. W. 489.] Even in fraud cases the general rule is that where the means of knowledge are at hand and are equally available to both parties, and the subject-matter is alike open to their inspection, if one of them does not avail himself of those means and opportunities he will not be heard to say that he was deceived by the other party's misrepresentations. [Cottrill v. Krum, 100 Mo. 397, 403, 13 S. W. 753.] The courts will not protect those who, with full opportunity to do so, will not protect themselves. However, if one party is induced to forego the investigation that one would ordinarily make in the protection of his own interests, through false representations or other fraudulent devices on the part of the other, and the representations or devices so employed are of such character that they are reasonably calculated, under the attending circumstances, to and do deceive him and thereby cause him to act without making the investigation, his failure in that respect is excusable. [Standard Mfg. Co. v. Slot, 121 Wis. 14. See also State ex rel. Union Pacific Railroad Co. v. Bland et al., 324 Mo. 601, 23 S. W. (2d) 1029.]

With reference to the facts of this case the rule just adverted to may be stated thus: The fact that a false representation was made, in respect to the paper is not necessarily sufficient to excuse plaintiff for affixing his signature thereto in ignorance of its contents, unless under all the circumstances, in view of his duty to give reasonable attention to the protection of his own interests, the false representation was reasonably calculated to, and did, induce him not to make the investigation which he would have otherwise made. The evidence has been fully set out and need not be restated. We are of

the opinion that it was sufficient to warrant a finding by the jury that Kendall's alleged fraudulent representations, ''Its just a receipt,'' was under the circumstances reasonably calculated to deceive and did deceive plaintiff, and thereby caused him to sign the release paper, in the belief that it was a mere receipt for wages, without making any effort to verify Kendall's statement as to its character and contents. Whether in the submission of the issue the jury were given proper directions is the next question.

The instruction told the jury that if plaintiff was unable to read on account of the condition of his eyes, he had a right to rely on the claim agent's representation that the paper was a receipt for plaintiff's wages for the year 1925. This was tantamount to telling the jury that Kendall's alleged false statement that the paper was a receipt for plaintiff's wages for the year 1925, in view of all the circumstances shown in evidence, was as a matter of law reasonably calculated to have deceived a man of plaintiff's capacity and experience, and to have induced him to sign the paper without having made any previous investigation as to its contents, which otherwise he would not have done. Very clearly the question was one of fact and not one of law.

The instruction is erroneous in another respect: it fails to require a finding that plaintiff relied on the alleged false representation, that is, that he was deceived thereby. When all the facts and circumstances shown by the evidence, including plaintiff's letter of June 28, 1926, to the defendant's claim department, are considered, it strains credulity somewhat to accept his statement that he was in fact deceived; yet, the question is one for the jury.

Because of the error in giving Instruction Number 5 the judgment is reversed and the cause remanded. All concur.