THE STATE EX REL. UNION PACIFIC RAILROAD COMPANY v. EWING C. BLAND ET AL., Judges of Kansas City Court of Appeals, and LEONARD ULMANN.—23 S. W. (2d) 1029.

Division One, February 3, 1930.

*Watson, Gage & Ess* for relator.

*John C. Nipp* and *William G. Butts* for respondent.

ELLISON, C.—Certiorari to the Kansas City Court of Appeals in Ulmann v. Union Pacific Railroad Company on the second appeal of that case from the Circuit Court of Jackson County. The first appeal is reported in 211 S. W. 910. The action was to enforce an attorney's lien based on a written contract of employment executed by one Peter Yiokas engaging the services of the plaintiff Ulmann as attorney in the prosecution of a personal injury claim against the relator, the Union Pacific Railroad Company. Yiokas settled with the railroad company for $200 and Ulmann sued the latter for his fee.

The railroad company contended the contract was void for fraud practiced on Yiokas by the plaintiff Ulmann and others in its procurement. On both trials in the circuit court there was a verdict for the defendant. But the last opinion of the appellate court holds the trial court erred in refusing to give an instruction declaring the defendant bound by Yiokas' contract, on the ground that he was guilty of negligence as a matter of law in failing to have the con-

tract read to him or fully explained before he signed it. The relator asserts this holding is in conflict with the last controlling decisions of this court on the question, including Dyrssen v. Union E. L. & P. Co., 317 Mo. 221, 295 S. W. 116, and Rau v. Robertson (Mo.), 260 S. W. 751. The opinion of the Kansas City Court of Appeals, omitting the introductory and concluding paragraphs, is as follows:

"The facts show that on February 29, 1914, one Peter Yiokas, a Greek, was injured while working for the defendant, and on June 10, 1914, defendant paid him the sum of $200 in settlement of his claim for damages on account of said injury. On the 9th day of March, 1914, Yiokas signed a contract with plaintiff, an attorney at law of Kansas City, Missouri, which recited that Yiokas employed plaintiff to sue upon or settle his cause of action against the defendant arising on account of the injury sustained by him as aforesaid and agreed to pay plaintiff the sum of fifty per cent of any money received as the result of suit or by compromise or settlement. Thereafter on May 29, 1914, plaintiff caused notice of his attorney's lien to be served upon the defendant. No suit was ever filed by plaintiff.

"This cause arose in a justice court. No pleading was filed by the defendant, but the defense made at the trial in the circuit court was that the contract, which purported to show the employment by Yiokas of plaintiff, was procured by plaintiff through fraud; that Yiokas could not read the English language and when the contract was presented to him it was represented to him by plaintiff's agents that it was merely a paper upon which he could procure a settlement from the defendant and that it was not a contract obligating Yiokas to pay plaintiff anything in case of settlement.

"Plaintiff testified that Yiokas in company with two other Greeks, Mitchell and Bahas, or Botulas, came to his office and employed him to represent Yiokas in the matter of prosecuting the latter's claim against the defendant, and at the time entered into the contract of employment in question. His testimony was corroborated by the testimony of Mitchell, a Greek, and one Cohen, who testified that they were present at the signing of the contract. Mitchell testified that the contract was explained to Yiokas before he signed it. There is a conflict in the testimony as to whether defendant's claim agent told Yiokas, when it settled with him, that it would be required to pay plaintiff the same sum that it paid Yiokas. There was testimony Yiokas wanted $600 in settlement but the claim agent told him that he could not pay so much, because defendant would be required to pay Yiokas' lawyer. According to the claim agent, Yiokas denied that he had employed a lawyer.

"The deposition of Yiokas was introduced in evidence. In this deposition Yiokas stated that his injuries consisted of an injury to his left arm; that while he was in a hospital in Kansas City, re-

covering from his injuries, two Greeks, Bahas and Mitchell, fellow countrymen of his, accompanied by a lawyer, called at the hospital and questioned him regarding his injuries; that he explained to them the facts surrounding the accident. He testified that he was not told the name of the lawyer who accompanied them and did not know who he was; that he knew Bahas well, the two having come from the same town in Greece; that he had met Bahas in this country but one time before his injury; that he again met Bahas shortly after he was injured when Bahas came to see him at the hospital; that these two occasions were the only times he had seen Bahas in this country before the day the contract purporting to employ plaintiff was signed; that he at no time told Bahas to procure a lawyer; that the conversation at the hospital upon the day on which the contract was signed, was carried on between Yiokas and the two Greeks in the Greek language. The evidence shows that plaintiff did not understand Greek.

"Yiokas further testified that he signed a paper, which the evidence shows was the contract of employment, at the solicitation of plaintiff and the two Greeks; he was asked:

" 'Q. Did you know what was in that paper when you signed it? A. I don't know. He never told me. He told me to sign that paper. They told me to sign this paper and that if I settled with the company and got anything and if I wanted to I might give them something. . . .

" 'Q. Did they tell you whether or not you were agreeing in that contract to pay Mr. Ulmann or anyone else a certain percentage out of anything you might recover from the Union Pacific Railway Company in this case? A. No. They never told me that. If they tell me that I never would sign it.'

"He further testified that he did not pay plaintiff, Mitchell or Bahas any filing fee for the suit; that he was never in plaintiff's office. He was asked—

" 'Q. Did you sign a paper? A. I signed papers; I don't know if that was a contract or not.

" 'Q. What did they tell you about it? A. You just sign this paper and when you come out of the hospial you can give it to the company and settle.

" 'Q. The first time that Mr. Bahas came to see you, did he talk to you about a lawyer? A. No, sir.

" 'Q. Didn't say anything? A. No.

" 'Q. What did he say to you the second time he came? A. The second time, do you want me to tell you again? He came with the rest of them and fetched me a paper and he says, "You sign this paper."

" 'Q. Who handed you the paper to sign? A. The attorney has it in his hands and then he handed it over to Mitchell and Mitchell handed it to me.

" 'Q. What did he say when he handed it to you? A. I tell you again that he told me to sign, that is all.

" 'Q. Why did you sign it? A. I signed it because he told me as soon as I came out of the hospital I go down to the company and settle it.

" 'Q. Did he tell you this was the company's lawyer? A. No, sir.

" 'Q. What did you think that paper was? A. I don't know.

. . .

" 'Q. You don't know what you thought it was, do you? A. No.

" 'Q. How long have you been in this country? Ten years at that time? A. Yes. . . .

" 'Q. You did not think you were signing away any rights, did you? A. No, I did not know what it was.'

"He further testified that he was unable to read English, but that he could understand it, and the evidence shows that he could understand English when he signed the contract of employment. He remained in the hospital about three and a half months. When he left the hospital he went with one Charuhas, a Greek friend of his who acted as interpreter, to the office of the defendant and there settled with the defendant. Yiokas testified that in making the settlement the agent of the defendant '. . . asked me I had a contract with some attorney, and I told him somebody came to the hospital and give me a paper to sign, but I didn't know if it was a contract or not.'

"Plaintiff insists that the court erred in refusing to give his instruction numbered 2, which reads as follows:

" 'The court instructs the jury that, under the law and the evidence in this cause, the defendant is bound by the terms of the contract in evidence, entered into by Peter Yiokas on March 9, 1914.'

"We think the court erred in refusing to give this instruction. Taking the evidence, and all reasonable inferences that may be drawn therefrom, in favor of plaintiff, the jury could well say that Mitchell and Bahas were the agents of plaintiff at the time the contract was signed by Yiokas at the hospital; that Yiokas could not read English and that Mitchell and Bahas represented to him that the paper he signed was something that could be used by him after he left the hospital to effect a settlement of his claim against the defendant. However, it is difficult to tell from Yiokas' testimony as to whether he was told that the paper was not a contract wherein he agreed to pay plaintiff anything. Certainly no direct statement of this kind was made to him. He testified, 'They told me to sign this paper and that if I settled with the company and got anything and if I wanted to I might give them something.' The evidence shows that plaintiff

did not do any talking directly with Yiokas, and whether Yiokas meant to testify that it was optional with him whether he wanted to give the two Greeks anything or whether he should give plaintiff anything or whether he should give any of the three anything, is left almost to speculation. It is quite evident that Yiokas did not understand fully what was contained in the paper he was signing, but he thought from what he was told that it was something that he could present to the defendant upon which he could settle his claim. He testified positively that he did not know what the paper was. Taking all of his testimony in its most favorable light to defendant, it would appear he did not ask what was in the paper, but that the two Greeks volunteered the information that it was a paper that would assist him in making settlement, or would cause a settlement to be brought about, but that he was not told what was the exact nature of the paper he was signing.

"It is well settled that where a person cannot read the language in which a contract is written, it is ordinarily as much his duty to procure some person to read or explain it to him before he signs it as it would be to read it before he signed it, if he were able to do so, and his failure to obtain a reading or an explanation of it, is such gross negligence as will estop him from voiding it on the ground that he was ignorant of its contents. [Shanley v. Gaslight Co., 63 Mo. App. 123; Penn v. Brashear, 65 Mo. App. 24; Book Co. v. Anderson, 179 Mo. App. 631.] In the case of Hall v. K. C. So. Ry. Co., 209 S. W. 582, 584, this court said:

" 'The general rule is that parties to written contracts are not permitted to go behind the writing. This rule, however, does not obtain where one of the parties while acting as an ordinarily careful and prudent man in his situation would act, nevertheless, is misled by some fraud of the other party. To make a case under the exception to the rule two things are indispensable: (1) Fraud in the procurement of the contract practiced by one party; (2) ordinary care and prudence exercised by the other.' See, also, Breeders Co. v. Wright, 134 Mo. App. 717, 721.

"Taking the evidence in its most favorable light to defendant, it would appear that Yiokas was told that the writing that he signed was something he could take to the defendant upon which he could procure a settlement, and assuming that the jury could find that he was also told that it was not a paper that would obligate him to pay plaintiff any attorney's fee, did he use ordinary care in signing the paper? He testified that he did not know whether it was a contract or not; that he did not know what the paper was that he signed; that he merely was told that he could use it in settlement of his case and that was the reason he signed it. The undisputed evidence therefore shows that he did not know whether the paper was a contract; that he did not ask that the writing be either read

or fully explained; that he did not know plaintiff, and he was not misled into believing that plaintiff was defendant's attorney. Under the circumstances it was incumbent upon him to either ask that the writing be explained in full to him or that it be read to him. As before stated, the evidence shows that he understood English; if he did not care to rely upon plaintiff, Mitchell or Bahas to read the paper, he at least could have had someone else in the hospital perform this service for him. He did none of these things and we think that the evidence shows that he signed the writing without taking proper care in so doing and that he was clearly guilty of negligence. [First National Bank v. Hall, 129 Mo. App. 286; Hall v. Railway, supra; Anderson v. Drug Co., 149 Mo. App. 554; C. St. P. M. & O. Ry. Co. v. Belliwith, 83 Fed. 437, 439; Woosley v. Wells, 281 S. W. 695, 701.]''

The opinion in effect concedes there was sufficient evidence to make a case for the jury that Mitchell and Bahas, the Greeks who accompanied the plaintiff Ulmann to the hospital, were in fact Ulmann's agents; that Yiokas could not read English; that the two Greeks made false statements to him concerning the nature and contents of the paper presented to him; and that Yiokas believed and relied on these statements, and signed the paper accordingly. But it is held he was bound by the contract nevertheless, because he was guilty of negligence as a matter of law in acting on the statements volunteered by the two Greeks without *asking* them to explain fully what was in the paper or else having them' or someone else in the hospital read it to him.

In support of that conclusion one Supreme Court and several appellate court decisions are cited, chief among which is another case by the Kansas City Court of Appeals, Hall v. K. C. S. Ry. Co., 209 S. W. 582, 584. From the Hall case an excerpt is quoted, saying, substantially, that parties to written contracts are not permitted to go behind the writing (so far as pertains to the issue here) except when two constituent and coexisting facts are shown: (1) fraud in the procurement of the contract practiced by one party; (2) ordinary care and prudence exercised by the other. The opinion seems to proceed on the theory that the so-called negligence of the injured party is a thing separate and apart from the fraud of the other party—a kind of offset. That this is the view of the appellate court is indicated by one of its more recent decisions, Long-Costello, Inc. v. Rider, 7 S. W. (2d) 387, 390, where it is said (metaphorically, doubtless) that the defrauded party was guilty of "contributory negligence."

We do not understand this to be the law either generally or as declared by the decisions of this court. At any rate it is inaccurate and misleading to say the negligence of one victimized by a fraud

nullifies the fraud. In 12 Ruling Case Law, section 123, page 371, the rule is thus stated:

"A person to whom false representations are made is not entitled to relief because of them if he might readily have ascertained the truth by ordinary care and attention, and his failure to do so *was the result* of his own negligence. . . . But this doctrine does not authorize deception in what is said or unsaid, and hence the effect of negligence on the part of the party deceived may be tolled by the active fraud of the other party." (Italics ours.)

See also, 26 C. J. sec. 59, p. 1142; 18 C. J. sec. 145, p. 226; 13 C. J. sec. 250, p. 371.

So, in Judd v. Walker, 215 Mo. 312, 337, 114 S. W. 979, 980, this court said:

"It has sometimes been loosely said that the *negligence* of the vendee will prevent recovery for the fraud of the vendor. The word 'negligence' used in that connection, as we understand its meaning in the law of negligence, is an unhappy expression. Fraud is a wilful, malevolent act directed to perpetrating a wrong to the rights of another. That such an act in a vendor should not be actionable because of the mere negligence or inadvertence of the vendee in preventing the fraud, ought to be neither good ethics nor good law. If one voluntarily shuts his eyes when to open them is to see, such a one is guilty of an act of folly (in dealing at arm's length with another) to his own injury, and the affairs of men could not go on if courts were being called upon to rip up transactions of that sort. . . . But when an element of wilful deception leads up to a transaction, the whole situation changes."

And again in Davis v. Forman, 229 Mo. 27, 48, 129 S. W. 213, 220:

"But if defendants were guilty of the misrepresentations or concealments charged they are in no position to complain of the plaintiff for having too long trusted in the truth of their statements. The following quotation from Morawetz on Corporations, sec. 100, cited in respondent's brief, very clearly states the law: 'Hence it was said by the Lord Chancellor (Chelmsford), in the House of Lords, "It appears to me that when once it is established that there has been any fraudulent misrepresentations or willful concealment by which a person has been induced to enter into a contract, it is no answer to his claim to be relieved from it, to tell him that he might have known the truth by proper inquiry. He had a right to retort upon his objector, 'You, at least, who have stated what is untrue, or have concealed the truth, for the purpose of drawing me into a contract, cannot accuse me of want of caution, because I relied implicitly upon your fairness and honesty.'"'"

Likewise, in Rau v. Robertson (Mo.), 260 S. W. 751, 755, where the rule was applied to a written release of the plaintiff's claim for

personal injuries, on which she later brought suit, this division of this court, speaking through RAGLAND, J., said:

"On the evidence adduced, the instant case falls within the exception. The question here *primarily is not whether plaintiff was negligent,* but whether through defendant's fraudulent conduct and representations she was led to sign without further investigation an instrument she did not intend to execute." (Italics ours.)

The real and ultimate question in such instances is whether the fraudulent acts and statements were of such nature that the other party had a right to rely on them; if they were there was no negligence; if not there was no actionable fraud. Hence it is misleading to say the evidence must show fraud *plus* absence of negligence. Or, putting it another way, some of the authorities say the fraud is actionable when it induces the negligence. [13 C. J. sec. 250, p. 372; Laird v. Keithley (Mo.), 201 S. W. 1138, 1142.] But it is a misnomer to use the word "negligence" at all in the above connection if it is to be understood as carrying its usual signification—failure to use the degree of care which an ordinarily prudent person would exercise in the same or similar circumstances. [45 C. J. sec. 52, p. 683, sec. 74, p. 699; Jablonowski v. Modern Cap Mfg. Co., 312 Mo. 173, 186, 279 S. W. 89, 92.] For the law of fraud does not exact of the victim that degree of caution which some other hypothetically prudent person would have used, but only reasonable care in view of *his* situation. All the cases show this. The snares of the fraudfeasor are most often set for the incompetent, the ignorant and the unwary.

Applying the foregoing general discussion to the concrete issues here, it may be and is true that the unprocured failure of one who signs a written instrument to inform himself as to its contents is an act of folly (harking back to the language of the Hall case supra). In other words, if the acts of one party do not intervene to prevent such investigation by the other, the latter will not be heard to say he was misled. But the contrary is true where the former fraudulently induces his adversary to refrain from inquiry, as where the fraudfeasor has, or by calculation and artifice obtains, the confidence of the other and anaesthetizes his sense of caution. That is the doctrine of the Rau case, supra, and of Woosley v. Wells (Mo.), 281 S. W. 695, 700-1, and of Dyrssen v. Union E. L. & P. Co., 317 Mo. 221, 227, 295 S. W. 116, 118.

The Woosley case quotes approvingly a statement from Anderson v. Meyer Bros. Drug Co., 149 Mo. App. 554, 573, 130 S. W. 829, 835, saying, "A person is expected to learn what an instrument contains before he signs it, either by reading or having it read, *or by having its contents stated by some one on whom he has a right to rely."* In both cases the facts were that someone was present on whom the signer did have a right to rely.

The Dyrssen case sets out the following from Tait v. Locke, 130 Mo. App. 273, 282: "Where one is *induced by another to rely* upon his reading the contract to him before signing, and such person misreads it, with a view to deceive, and thus obtains his signature to a document different from that intended, relief may be had on such showing alone. But this proceeds from the fact that such a betrayal of confidence is both so revolting and so infrequent that it is not likely to be anticipated by the average man." The conclusion in the Dyrssen case on its particular facts was that the one party was not induced by the other to rely on his reading of the contract, and that there was no confidential relation between them.

In another case, not quite so much in point, perhaps, but still enough to show the rule—Morrow v. Franklin, 289 Mo. 549, 576, 233 S. W. 224, 231, 232—a stockholder of a bank bought some of its shares of stock from certain of its officers, including one Franklin. Later he sued them for damages for fraud and deceit in making false representations concerning the financial condition of the bank. The court gave an instruction saying, although the plaintiff was a stockholder and had access to the bank books, wherefrom he could have ascertained the true conditions, yet he had a right to rely on the representations made by the officers without resorting to an examination. This court said: "The evidence shows that plaintiff had confidence in Franklin, and this Instruction 8 was not error."

In the instant case the evidence, as recited in the respondents' opinion, shows the plaintiff Ulmann went to the hospital where Yiokas was confined accompanied by two of the latter's countrymen, Mitchell and Bahas. In thus going and in advising Yiokas the two Greeks really were acting as Ulmann's agents, or so the jury might have found, though they posed as Yiokas' friends. This we must conclude from his testimony. Yiokas knew Bahas well. They had come from the same town in Greece, although they had met only once in this country before Yiokas was hurt. Following that Bahas went once to the hospital to see Yiokas, but made no suggestion about a lawyer. Later Bahas went again, this time with Mitchell and Ulmann. The two Greeks conversed with Yiokas in their native tongue. Ulmann stood by and said nothing. They told him to sign the paper and when he got out of the hospital he could give it to the Company and settle; and that if he got anything he might give them something *if he wanted to.* Yiokas could not read English. No one else was close at hand, so far as the record shows.

Considering the character of representations made and the way they were made through two of Yiokas' countrymen, and having in mind the long acquaintance between Bahas and Yiokas and the illiteracy, isolation and helpless plight of the latter, we are constrained to hold there was enough evidence, under the decisions of

this court hereinbefore reviewed, to support a jury finding for the relator on the theory of actionable fraud—that Yiokas was induced thereby to rely on the statements made to him concerning the nature and purpose of the contract without having it read to him, or further explained. The detailed facts are, perhaps, not closely parallel to those in the cases decided by this court, but the ultimate facts are nearly enough alike to raise the same legal question and make the conclusion of the Court of Appeals conflict with the rulings of this court. In that sense they are "similar" under the rule applicable to certiorari. [State ex rel. Arel v. Farrington, 272 Mo. 157, 162-3, 197 S. W. 912, 913.]

For the reasons assigned the opinion and judgment of the Kansas City Court of Appeals are quashed. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.