ROSCOE CONKLIN v. MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant.—55 S. W. (2d) 306.

Court en Banc, December 16, 1932.

*Thomas J. Cole* and *Dearmont & Russell* for appellant; *D. A. Butler, David A. Smith* and *Ralph D. Walker* of counsel.

C. O. Inman and C. R. Cravens for respondent.

RAGLAND, J.—This is an appeal by defendant from a judgment against it for $12,500, the amount assessed by a jury as the damages sustained by plaintiff as the result of personal injuries. Defendant pleaded a full release in bar of the action. Plaintiff in his reply alleged that the release was obtained through the false and fraudulent representations of defendant's claim agent. Whether the evidence with respect to the matters set up in avoidance of the release was sufficient to make a submissible case for the jury is the decisive question in the case.

Plaintiff was in the employ of defendant as a machinist. On November 17, 1924, as he was preparing to get down from the cab of an engine, where he had been engaged in making repairs, he was caused through the negligence of other employees of defendant to fall backward to the ground, falling across an iron pipe. The physician who examined him immediately after his fall was unable to discover anything in the way of injury other than sprains and bruises; he advised merely that plaintiff make applications of liniment. Plaintiff thereafter continued in the same work for defendant until on or about the 15th day of April, 1928, a period of more than three and a half years. During that interval he suffered severe pain from time to time—in the lower part of his back and in his left leg, causing him to lose considerable time. His ailment grew progressively worse, causing him to give up work entirely on the date last mentioned. About that time he went to the Missouri Pacific hospital where he was examined by one of its staff surgeons, Dr. Stewart. Dr. Stewart caused X-ray pictures to be made of his back and hips. These disclosed, among other abnormalities, a slight separation of the sacro illiac joint on the left side, a fracture of the transverse process of the twelfth dorsal vertebra and a compression of the fifth lumbar vertebra. Following this disclosure plaintiff's body was put in a plaster paris cast. A few days later, on May 25, 1928, the release in question was executed at the hospital.

Shortly before entering the hospital as a patient plaintiff filed with the claim department of defendant a claim for his injuries, and made one or more visits there in an effort to negotiate a settlement. After his entrance into the hospital, his wife visited defendant's claim agent on one or more occasions, urging an immediate settlement, on the ground of her pressing need of money. Finally they tentatively agreed upon the terms of a settlement and went together to the hospital where her husband was. As to what occurred there and as to other matters touching the execution of the release we will let the plaintiff speak:

"Q. Now, just tell the jury what happened, and if he asked you any questions, tell the jury what transpired in that room from the time he entered it until he left and you got six hundred dollars? A. Well, I think he came on the 23rd or 24th, at first. Mr. Butler was out there and talked to me about five hundred dollars. When he entered the room, he got there around 12:30 or 1:00 o'clock, and my wife was with him, and there were two patients in the room, two bed-patients. They were patients that were allowed to get up and walk around, and the patient in the bed next to me had two broken ankles and a broken leg. He told this man to get out of the room and close the door and he pushed the door shut and after that he talked to me. He came over to the bed and said they had decided to raise that

amount from five hundred dollars to six hundred dollars and he asked me if I wouldn't take six hundred dollars, and release them from any suit. I said no, I wouldn't take that amount because I didn't know what my injuries were, and he said he had talked with Dr. Stewart that morning and Dr. Stewart told him I would be well and out of the hospital in three or four months, and that I would be back at work in four months at the very least. I had asked Dr. Stewart three or four times, and he told me—after he assured me that Dr. Stewart had assured him that I would be well and out of the hospital in four months and be back at work on my old job, he fixed up this paper for $150 a month for four months, and I signed it. I thought if I would be well and back to work on my old job in three and one-half or four months, I would settle the matter and accept the six hundred dollars, under the agreement that I was to have my old job back.

"Q. What was it that induced you to take the six hundred dollars? A. Mr. Butler had assured me that I would be well and out of the hospital in four months.

"Q. That was Dr. E. J. Stewart he was talking about? A. Yes, sir. . . .

"Q. That is the one that had been treating you right along? A. Yes, sir.

"Q. Did Dr. Stewart ever tell you what your condition was? A. No, sir. I asked him several times and he never would give me any definite answer.

"Q. Did you try to get any other information from any other doctor? A. I did from the interne. These were the only two doctors that attended me.

"Q. Did you ever ask the other doctors how long it would be before you could work? A. I did, and they wouldn't give me any information. . . .

"Q. You finally signed a release there for $600? A. Yes, sir; I did. . . .

"Q. Did they give you money or a check? A. A draft for $600.

"Q. Did you cash that? A. I signed it and my wife deposited it in the bank. . . .

"Q. You knew that when you signed it (the release)—you knew this was a settlement of this case? A. Yes, sir.

"Q. The only reason you are trying to set that aside is because Mr. Butler told you that Dr. Stewart said you would be well in three or four months? A. Yes, sir.

"Q. That is the only reason you want it set aside now—isn't that the only reason you have alleged to set it aside? A. Yes, sir.

"Q. You thoroughly understood what you were signing at the time? A. I did, and I understood I would be better off to do it.

"Q. Did Dr. Smith ever tell you your injuries were serious? A. He told me he didn't know how my injuries were and he was not in a position to read the X-ray and tell me."

The statement filed with defendant's claim department by plaintiff as the basis for the allowance of his claim contained the following:

"On the 24th or 25th of April, I went to Dr. W. A. Smith with office (I think in the Gorelock Building) Webster Groves, Mo., and he took a flouroscope of my side and three X-rays and advised me that my fourth vertebrae was out of line. Dr. Smith advised me that it would be at least two years before I would get any permanent relief from the pain from which I was suffering."

The statement that Dr. Stewart told the claim agent that plaintiff would be well and out of the hospital in three or four months and would be back at work within four months at the very least was wholly false. The claim agent denied emphatically that he made any such statement to plaintiff, but for the purpose in hand plaintiff's testimony must be assumed to be true.

I. The only *fact* contained in the statement made by the claim agent to respondent was that Dr. Stewart had expressed to him (the claim agent) an opinion that respondent would be well and able to go back to work within four months. Respondent's belief in the existence of the fact *that such opinion had been given the claim agent* was the sole inducing cause which led him to accept defendant's offer of settlement and execute the release. Whether such fact was true or false could easily have been ascertained by either respondent or his wife, who was assisting him in trying to effect a settlement. Dr. Stewart was a daily visitor at the hospital, he was treating respondent. It is true that he and the other physicians at the hospital had declined to give respondent any opinion as to when the latter would be well and able to work. But that did not prevent respondent from making the inquiry of Stewart as to whether he had expressed the opinion to the claim agent which the latter stated he had. No fraudulent devices had been practiced upon respondent to cause him to refrain from making such inquiry. Nothing had been done to anaesthetize his sense of caution. No relation of confidence and trust existed between him and the claim agent, they were standing at arms' length in their negotiation of a settlement.

In dealing with releases, such as the one in question, this court has in recent years gone a long way in its efforts to protect "the foolishly credulous, as against the machinations of the designedly wicked," as consonant with the administration of pure justice. [Rau v. Robertson, 260 S. W. 751; State v. Bland, 324 Mo. 601, 23 S. W. (2d) 1029.] But we have never lost sight of the principle that the courts will not protect those who, with full opportunity to do so, will not

protect themselves. Where the means of knowledge are at hand and are equally available to both parties, and the subject-matter is alike open to their investigation, if one of them does not avail himself of those means and opportunities he will not be heard to say that he was deceived by the other party's misrepresentations. [Ensler v. Railroad, 324 Mo. 530, 538, 23 S. W. (2d) 1034.]

II. But if Dr. Stewart himself had stated to respondent that the latter would be well and able to return to work within four months, respondent would have had no right to rely upon such statement as a basis for making a settlement with the defendant. It contains no element of fact. It is the expression of an opinion pure and simple. Not only that, but it relates to a future occurrence and not to a past or present fact. The question was thoroughly considered by the Court en Banc in Wingfield v. Railroad, 257 Mo. 347, 166 S. W. 1037. It was there held that such an opinion, however false or mistaken it might be, was not a ground for setting aside a release such as the one in question. It was noted by the court in passing that it was not in accord in so holding with some courts of other jurisdictions. It is doubtlessly true that an opinion not given in good faith may *in connection with other fraudulent artifices* constitute a sufficient ground for avoiding a release. But that is not this case. The alleged opinion, and nothing else, induced respondent to act. The fact that the purported opinion came to him at second hand through the mouth of defendant's claim agent neither added to its validity and trustworthiness nor transformed it into a matter of substance upon which he had a right to rely.

The defendant's demurrer to plaintiff's evidence should have been sustained by the trial court. The judgment appealed from is reversed.

The divisional opinion of *Ragland, J.*, is adopted as the opinion of the Court en Banc, *Henwood, J.*, concurring, *White, J., Atwood, C. J.*, and *Ellison, J.*, concurring in paragraph I and result, and *Frank* and *Gantt, JJ.*, dissenting.