Joseph E. HECKENKAMP, Jr., Appellant,

v.

John L. KENNEDY, Appellee.

No. 16180.

United States Court of Appeals
Eighth Circuit.

June 24, 1959.

Harry Carstarphen, Hannibal, Mo. (Frank B. Harvey, Hannibal, Mo., and R. G. Heckenkamp, Springfield, Ill., on the brief), for appellant.

Ben Ely, Hannibal, Mo. (Roger Hibbard, Hannibal, Mo., and George W. Peterson, Washington, D. C., on the brief), for appellee.

Before SANBORN, VAN OOSTERHOUT, and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

This diversity personal injury action presents the principal question of the legal effect of a release signed by appellee, plaintiff below, which by its terms fully and completely released all claims accruing to plaintiff for injuries he sustained as the result of being struck while a pedestrian, by an automobile being driven and operated by the appellant, defendant.

After the action was removed from the Circuit Court of Marion County, Missouri, to the United States District Court, defendant filed his answer in which the issues were joined on the allegations of negligence. As an affirmative defense, the defendant alleged that on January 22, 1955, plaintiff entered into and executed an agreement with defendant whereby, in consideration of the payment to plaintiff of $6,000, he fully and finally released defendant of and from any and all claims arising from the personal injuries sustained as the result of the "auto-pedestrian accident" which occurred on December 30, 1954. The answer pleaded the release in haec verba, but no useful purpose will be accomplished by incorporating it herein. By way of reply, plaintiff admitted that he signed the paper writing and admitted that he received the sum of $6,000. To avoid the effect of the release, plaintiff alleged that it was executed by him as the result of certain fraudulent conduct on the part of one W. F. Cook, the representative and agent of the Illinois National Casualty Company, defendant's liability insurance carrier. The fraud relied upon will be discussed in the further course of this opinion. The trial court denied defendant's motion for a directed verdict, and by instructions which hypothesized the facts as developed by the evidence, submitted the question of the validity of the release to the jury. Following a verdict in favor of the plaintiff, defendant filed motion for judgment in accordance with his motion for directed verdict, grounded in part upon the plea that the execution of the release barred plaintiff from maintaining the cause of action. This motion was likewise overruled, and an appeal was timely perfected.

In view of defendant's contention urged throughout the trial and on appeal that the paper writing executed by plaintiff constitutes a bar to this action as a matter of law, we shall review the evidence leading up to and surrounding the execution of the document in question from the standpoint most favorable to plaintiff.

At the time of the accident, plaintiff was working near Quincy, Illinois, as a section hand for the Burlington Railroad. While plaintiff was walking westwardly on the shoulder of U. S. Highway No. 24 near West Quincy Station in Missouri, he was struck by defendant's automobile. He was taken to a hospital in Quincy, Illinois. The third or fourth day after the occurrence, Mr. Cook called upon plaintiff, but at that time there was no talk of settlement. After plaintiff's wife arrived from their home in Minnesota, Cook visited with plaintiff the second time, but "no figures of settlement were discussed then." Thereafter plaintiff called or wrote to Cook requesting that he come to the hospital on Friday, as he knew his wife would also be present. We now quote from plaintiff's testi-

mony to reveal the events which culminated in the execution of the release:

"Q. When he came on that occasion, was there any discussion had between you two about a settlement? A. Yes. I had asked him if he would guarantee the payment of the hospital and doctor at the Quincy Hospital, so that we could go home, because when the missus came down the first week Dr. Merritt told her I could go home in two weeks provided everything was all right.

"Q. All right. What, if anything, did he tell you with respect to guaranteeing the hospital and doctor bill? A. He said the company would not guarantee payment of any bill, but they would make a settlement and I could pay my own bills.

"Q. Going back to the morning that Mr. Cook was there and had told you that he couldn't pay the expenses, guarantee the expenses, but they could pay you, what, if anything, did you say to him about figures, if you did? A. Well, I just asked him what they would allow, when he said they couldn't make a settlement, and he told us to sit down and figure out what we should have coming, and he would have to call it into Quincy to get approval on anything. Dr. Merritt had told me there was a possibility of a future bone graft, because very often that type of a break did not heal properly. Dr. Merritt informed me normal healing for that type of break was between six and eight months. We then asked Cook $12,-000.00, I think.

"A. He came back and said it was impossible for him to pay that amount. That all they would pay on that type of break was six thousand dollars.

"Q. Did he say why? A. Because something about the state insurance law or compensation laws or something. That is all that that type of break called for with a normal healing period, was six thousand.

"Q. What, if anything, did you say to that, if you said anything? A. Well, I don't recall if I said anything.

"Q. Was this question of future operation discussed? A. Yes, it was.

"Q. What was the result of that discussion? What did you learn? A. The settlement of six thousand dollars actually was for the original break as it was. Any future bone graft or abnormal longer or long healing period would be taken care of through an adjustment.

\* \* \* \* \* \*

"The Court: Just tell the words. What were the words he used, if you can remember, or the essence of them. A. That they were allowing that six thousand dollars on this type break. That is all the state would allow or the compensation law or something, I don't know which.

"By Mr. Hibbard: Q. Did he say anything about any future expense? A. Yes. If there was, they would be adjusted by the insurance company by turning in my bills from the hospital, doctor, or whatever the expenses were.

"Q. Was that statement made to you by Cook? A. Yes."

Mrs. Kennedy, plaintiff's wife, testified that she arrived at the hospital on the Friday referred to in the foregoing testimony. Bearing on the subject of settlement she stated:—"Mr. Cook asked us to have some figures so we would know approximately what we felt we should have. We prepared figures and estimates. I inquired for the hospital and my husband asked for the doctor bills. In making up the list of items to comprise final total for settlement we always had in mind that it would be possible that there might have to have (be) future surgery. I submitted the figures to Mr. Cook. I do not remember whether

I did it by phone or personally. I told Mr. Cook we wanted $12,000. He said they would pay $6,000. Mr. Cook said in my presence, 'Because they were judging it from the time of injury at that time with no supposition of what might be in the future.' He said our future bills would have to be taken care of at that time by the insurance company, by presenting the bills to them. Mr. Cook came Saturday and brought check for $6,000. and the paper to sign, and I signed it." With regard to the figures submitted by plaintiff's wife, it stands uncontroverted that plaintiff's wife furnished the following to Cook:

| | |
|---|---:|
| Hospital, | $1,239.95 |
| Anesthesia, | 40.00 |
| Wages for one year for pltf. | 2,833.72 |
| Truck garden, | 100.00 |
| Transportation, | 150.00 |
| Estimated doctor and hospital bills for plft. after he returned to his home, | 500.00 |
| Drugs for pltf. after he returned home, | 100.00 |
| Bill of Dr. Merritt, | 379.00 |
| Mrs. Kennedy, for two months service in taking care of her husband, | 640.00 |
| Total | $5,982.67 |

The check for $6,000 was delivered by Cook on Saturday, and, at the same time, the release was signed. We will again let plaintiff describe what actually took place in connection therewith:

"Q. Did he come there to your room, or where did you talk to him? A. In the room.

"Q. What, if anything, happened then? What did he do? What did he give you, or what happened? A. He had the check that came in the mail to him, and he delivered the check over there.

"Q. How much was it? A. Six thousand.

"Q. Now, in that connection did you sign any papers? A. We signed the paper.

"Q. Tell us about that. Who had the paper? A. Mr. Cook brought it in.

"Q. What did he say about it, or what did he do? A. He said he had this check and this paper and before he could deliver us the check, we would have to sign this paper.

"Q. Did you read the paper? A. I glanced over it."

Over objection, the court also permitted plaintiff to state that when he signed the paper he thought that the payment of the $6,000 was "for the break at this time that it was in, with a healing period of from six to eight months."

As to the background, experience and general capabilities of plaintiff, it is revealed that he is a man 58 years old; he received an elementary education, served in the war, farmed, and then worked in a milk plant in Minneapolis. His position as manager thereof required him to "manage the men" working at the plant and "weigh in" the milk delivered by the farmers and enter a record thereof on a ledger sheet. He also worked in another dairy in Watertown, Minnesota, where he performed the same type of services. He had also been employed at Glen Lake Sanitarium, doing maintenance and repair work. He reads newspapers and magazines with understanding. While testifying, plaintiff read without any apparent difficulty the endorsement which appeared on the back of the $6,000 draft. Mrs. Kennedy stated

she was a registered nurse and that at the time her husband was injured she was pursuing her profession at Glen Lake Sanitarium.

In answer to appellant's contention that the release effectively bars plaintiff, plaintiff urges that the evidence, the pertinent portions thereof having been detailed above, affords ample proof that fraud was practiced in the procurement of the release, i. e. there was *fraud in the factum* which rendered the instrument void. More precisely, the argument is vigorously pursued that Cook falsely and fraudulently represented to plaintiff and his wife that the payment of the $6,000 covered only the then ascertained damages, and that if future hospitalization and surgical treatment were required, plaintiff could look to the insurance company for payment; that the paper writing constituted only a receipt or at most a partial release; that the effect of Cook's statement was "You are not making a complete settlement that will bar all of your rights in the future." Plaintiff goes further, and contends that he had the right to rely on such statements to the extent that he was completely absolved and excused from making any independent effort to ascertain the contents, purpose and effect of the instrument which he executed.

While, as we shall presently see, the Missouri courts have, in some situations ruled that the releasor was not bound by the terms of the instrument because of fraudulent conduct which either induced or procured the release, we are convinced that this is not such a case, and that plaintiff cannot avoid the legal consequences of his act in executing the release.

 Examination of opinions by the Missouri courts makes it clear that release cases follow no particular pattern, and each must be decided upon its own facts. However, serving as guides in all cases of this character are certain fundamental principles of law. In *Wood v. Robertson*, 245 S.W.2d 80, at page 82,

the Supreme Court of Missouri recognized the basic elements of actionable fraud to be:

> " '(1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon.' "

In our view of the facts and circumstances, plaintiff's case must fail because element (8) above quoted is lacking. While courts have gone a long way to "protect 'the foolishly credulous, as against the machinations of the designedly wicked,' as consonant with the administration of pure justice," *Conklin v. Missouri Pac. R. Co.*, 331 Mo. 734, 55 S.W.2d 306, 308,

> " * * * courts will not protect those who, with full opportunity to do so, will not protect themselves. And where the means of knowledge are at hand and are equally available to both parties and the subject matter is alike open to their investigation, if one of them does not avail himself of those means and opportunities he will not be heard to say that he was deceived by the other party's misrepresentation, if there be no confidential relationship between the parties and if no fraudulent devices have been practiced upon the one alleged to have been defrauded to induce him to refrain from making inquiry, or to anesthetize his sense of caution. Conklin v. Missouri Pac. R. Co., 331 Mo. 734, 55 S.W.2d 306; State ex rel. Union Pac. R. Co. v. Bland, supra [324 Mo. 601, 23 S.W.2d 1029]; Poe v. Illinois Central R. Co., 339 Mo. 1025, 99 S.W.2d 82; Rau v. Robertson, Mo.Sup., 260 S.W. 751." *Wood v. Robertson*, 245 S.W.2d 80, 84.

Chancellor Kent's pronouncement that the law affords to every one "reasonable protection against fraud in dealing; but it does not go the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information," [2 Kent's Commentaries, 14th Ed., p. 485] is no less applicable today, and has been so recognized by the Missouri courts. See Local Finance Company v. Charlton, Mo.App., 289 S.W.2d 157, 163, and Dyrssen v. Union Electric Light & Power Co., 317 Mo. 221, 295 S.W. 116, 118.

As noted in Wood v. Robertson, supra, when the fraud involved extends to inducing a party to refrain from inquiry, as where the defrauder has by calculation or artifice, obtained the confidence of the other and causes him to forego caution, 245 S.W.2d 80, at page 84, Missouri courts consider this as a material factor in determining the effect of releases obtained under such circumstances. See and compare, Conklin v. Missouri Pac. R. Co., supra; Rau v. Robertson, Mo.Sup., 260 S.W. 751, 755; State ex rel. Union Pac. R. Co. v. Bland, 324 Mo. 601, 23 S.W.2d 1029, 1033; Ensler v. Missouri Pac. R. Co., 324 Mo. 530, 23 S.W.2d 1034, 1037; Schubert v. St. Louis Public Service Co., Mo.App., 206 S.W.2d 708, 715, affirmed 358 Mo. 303, 214 S.W.2d 420.

However, determinative of plaintiff's contention that he should not be held to his release, are the decisions of the courts of Missouri, holding that parties are not entitled to rely on representations of agents and others, absent some confidential relationship or fraudulent inducement tending to convince the releasor he need not make an independent investigation of facts. See Homolla v. Gluck, 8 Cir., 248 F.2d 731 (plaintiff alleged she relied on representations of agent that she had already signed a release); Conklin v. Missouri Pac. R. Co., 331 Mo. 734, 55 S.W.2d 306 (agent's representations concerning doctor's report); Dyrssen v. Union Electric Light & Power Co., 317 Mo. 221, 295 S.W. 116 (plaintiff, a man of intelligence, complained that his foreman misread the paper which he signed); Powers v. Kansas City Public Service Co., 334 Mo. 432, 66 S.W.2d 840, 845 (plaintiff, perhaps of subnormal intelligence, alleged she thought payment was a "donation"); Kavadas v. St. Louis Southwestern Ry. Co., Mo.App., 263 S.W.2d 736 (plaintiff, a foreigner, could not read or write English; alleged he was told paper was receipt for one day's wages, $12.18); Wood v. Robertson, Mo.Sup., 245 S.W.2d 80 (alleged false representations by attorney regarding medical report); Brennecke v. Ganahl Lumber Co., 329 Mo. 341, 44 S.W.2d 627 (plaintiff could not read without glasses; believed paper was receipt for wages). Of particular interest to the case at hand is the decision of the Missouri Supreme Court in Poe v. Illinois Cent. R. Co., 339 Mo. 1025, 99 S.W.2d 82, where the facts are strikingly similar and tend to be stronger than the situation before us, in that defendant's agent was, we might charitably say, "most aggressive," in stating and inferring that the settlement was for wages up to date only. There was further evidence that plaintiff could not read; that the agent did not read the paper, but said "O, well, it don't mean anything, but it is a receipt for your wages up to date and you will have to sign it before you go back to work" Id., 99 S.W.2d at page 85. After reviewing various decisions (some of which are relied upon by plaintiff here), the Court found against plaintiff, observing that no confidential relationship existed; that plaintiff did not read the release or ask to have it read to him; that he was under no handicap preventing him from managing his affairs; and that consequently he must be held accountable for his act in giving the release. Plaintiff here frankly admits that the Poe decision is opposed to cases cited to uphold his position, but claims that this decision was in effect overruled by the Missouri Supreme Court in Schubert v. St. Louis Public Service Co., 358 Mo.

303, 214 S.W.2d 420, affirming Mo.App., 206 S.W.2d 708. The Schubert case distinguishes the Pope case on its facts but does not expressly, nor by implication overrule its teachings. We further note that in Schubert, not only did the agent there misrepresent the contents of the paper, but his conduct went further, tending to deceive and induce plaintiff into believing that it was a receipt, so as to excuse her from making a further personal inquiry. See 206 S.W.2d 708, at page 715.

Our analysis of the evidentiary facts, in light of the governing principles of law, compels the conclusion that the release here was not a product of actionable fraud.

At the outset it should be emphasized that we are not dealing with a weak, infirm or illiterate plaintiff, or one whose mental faculties had been dulled or impaired because of the injuries he sustained, neither is there any proof that his sense of caution had been anesthetized by his physical condition or by the conduct of Cook in connection with the settlement. While plaintiff's scholastic background was limited, and there is nothing to indicate that he was a mental genius, the record of his activities warrants the conclusion that he was an individual of average intelligence. He was able to and did read—the answers he gave to questions during course of trial reveal that his ability to comprehend and understand was that of a normal individual possessing a like formal education. The record is silent as to Mrs. Kennedy's educational attainments, but she was a registered nurse, following her profession.

Secondly, there is no proof that a confidential relationship existed, there was no evidence of overreaching by Cook and no evidence of artifice or deception whereby plaintiff or his wife was induced to forego an examination of the instrument. To the contrary, plaintiff's own testimony demonstrates that all dealings and negotiations were at arm's length. For instance, at the outset of the settlement discussion on the Friday, after Cook had responded to plaintiff's request to come to the hospital, Cook stated that his company would not guarantee payment of the hospital and doctor bills as plaintiff had requested, "but they would make a settlement and I could pay my own bills." This led to the suggestion that plaintiff and his wife "sit down and figure out what we would have coming, and he would have to call it into Quincy to get approval on anything." The figures prepared upon information obtained by plaintiff and Mrs. Kennedy, and furnished to Cook included future expense and damages. On the basis of the figures submitted there was a demand made for $12,000. Cook countered with an offer of $6,000 which was accepted. Now we are mindful of Cook's statement, substantially to the effect that the acceptance of the $6,000 by plaintiff and the execution of the paper writing, were intended only as a partial settlement, and though this statement must be considered as false, nevertheless, absent a legal basis for the right of reliance thereon, plaintiff could not, as he apparently did, blindly ignore the realities of the situation. It is evident that the exercise of a minimal degree of caution by plaintiff or his wife, would have made manifest the actualities of the entire transaction. They were afforded ample opportunity to read and examine the instrument in question, which we observe is relatively short, containing a total of 23 lines. A cursory inspection thereof would have disclosed these large capitalized letters across the top thereof: "FULL AND FINAL RELEASE COVERING ALL CLAIMS OR RIGHTS OF ACTION OF EVERY DESCRIPTION, PAST, PRESENT OR FUTURE," and from the unambiguous and understandable language appearing in the body of the document, plaintiff would have learned that it was a *full* and not *partial* release that he was executing. Moreover, the draft, which was delivered to plaintiff and his wife and retained by

them for a reasonable period of time, was well calculated to inform an individual of ordinary prudence as to the nature, purpose and effect thereof. On the face thereof, in ordinary sized print appears, "In full settlement of all claims arising out of a loss occurring on or about 12/30/54 under the policy described below." Directly above the endorsements of plaintiff and Mrs. Kennedy, appear these words: "ALL PAYEES MUST ENDORSE THIS DRAFT. By endorsing this draft the payee[s] accept[s] same in full settlement and release of all claims arising out of occurrence mentioned on the face hereof."

Further elaboration on the facts is unnecessary. From what has been said it would appear plaintiff is in that category so aptly described by the Supreme Court of Missouri, in this quote taken from Poe v. Illinois Cent. R. Co., supra, 99 S.W.2d at pages 89–90:

"While the law affords every one reasonable protection against fraud, it does not go to the romantic length of establishing the relation of parent and child or guardian and ward between courts and adults capable of managing their affairs, in full possession of their faculties and unrestrained in action, and indemnify them when dealing at arm's length against the consequences of their own indolence, listless inattention, or unwarranted credulity in the transaction of business affairs * * 'If one voluntarily shuts his eyes when to open them is to see, such a one is guilty of an act of folly (in dealing at arm's length with another) to his own injury; and the affairs of men could not go on if courts were being called upon to rip up transactions of that sort.' [Citing Judd v. Walker, 215 Mo. 312, 337, 114 S.W. 979, 980]"

The judgment is reversed and the cause is remanded with directions to the trial court to enter a judgment for the defendant.