MABLE POWERS v. KANSAS CITY PUBLIC SERVICE COMPANY, Plaintiff in Error.—66 S. W. (2d) 840.

Division Two, December 20, 1933.

*Hogsett, Smith, Murray & Trippe* for plaintiff in error.

434

*Grover & Browne, Allan R. Browne* and *Benj. W. Grover* for defendant in error.

436

WESTHUES, C.—Defendant in error brought this suit in equity to set aside a stipulation and judgment dismissing with prejudice her action asking $10,000 in damages against the plaintiff in error. The trial court entered a decree setting aside the stipulation and judgment of dismissal and reinstated the original suit for damages.

The case was brought here by a writ of error. Mable Powers, defendant in error, was the plaintiff and the Kansas City Public Service Company was the defendant in both actions. In the course of the opinion we shall refer to Mable Powers as plaintiff and the service company as the defendant. In the original suit plaintiff asked damages against defendant for the death of her husband, William Powers, who was fatally injured on September 21, 1929, when struck by one of defendant's street cars. The accident occurred on defendant's private right of way at or near the Smalley Avenue station between Independence and Kansas City, Missouri. Powers was sitting on the track and evidently did not notice a westbound car approaching and was struck by it. Suit for damages was filed and later plaintiff, without consulting her attorneys, went to the office of defendant's attorney and settled her claim for $250. She signed a stipulation authorizing the suit to be dismissed with prejudice, which was accordingly done. Later plaintiff filed this suit to set aside the judgment of dismissal, alleging that it was procured by fraud. Plaintiff also alleged that she was mentally deficient and, therefore, did not understand the effect of the stipulation and release which she had signed.

Defendant contends that the trial court erred in entering judgment for plaintiff because she failed to prove that she had a meritorious claim; also that she failed to prove the alleged fraud or mental incapacity to contract.

We do not deem it necessary to go into detail as to the merits of plaintiff's claim. The evidence taken at the trial covers nine hundred printed pages of the abstract of the record. We will state

only enough of the facts for a disposition of the points made. The evidence disclosed that the accident occurred on defendant's private right of way. Signs, warning the public against trespassing, were posted at various points along the track. Defendant contended and offered evidence that Powers, the deceased, was sitting on the track in a drunken stupor about thirty or more feet west of the Smalley station and that the motorman could not and did not see him until it was too late to stop the car in time to avert striking Powers; that everything was done with the appliances at hand that could have been done to avoid striking deceased. A number of plaintiff's witnesses testified that they heard an unusual sounding of the warning bell of the car and almost simultaneously therewith a loud and unusual squeaking of brakes and wheels of the car. After hearing this these witnesses immediately went to the scene of the accident. It was after eight o'clock in the evening and very dark. The body of deceased was found lying between the two tracks from thirty to fifty feet west of the station. An empty bottle was found in deceased's pocket and witnesses testified of the presence of an odor of alcohol. The attendants at the hospital where deceased was taken testified that they detected an odor of alcohol on the breath of deceased. Deceased sustained an injury to his head from which he died about twenty-four hours after the injury.

Plaintiff introduced evidence to the effect that there were marks on the roadbed indicating feet had been dragged between the rails from the west end of the car stop at Smalley station to the point where the body was found. Plaintiff also introduced some testimony as to the distance a motorman could see down the track at night and the distance in which a car could be stopped, varying according to its speed. This evidence tended to prove that the motorman could have seen deceased in time to have stopped the car and prevented striking him. Viewing the evidence in its most favorable light to plaintiff we are holding, for the purpose of this opinion only, that plaintiff had a case for the jury under the humanitarian doctrine. If plaintiff had had no cause of action then of course she could not have been defrauded and could not have maintained her present suit.

We will now proceed to examine the evidence of the alleged fraud and mental incapacity. Powers was injured on Saturday night and died the following day. Monday the attorneys who filed plaintiff's suit called on her at her home and she signed a contract employing them to represent her on a basis of fifty per cent of the amount recovered. Whether or not the attorneys solicited the case or whether they were asked to come and see plaintiff is immaterial at this time. On September 27, 1929, the attorneys filed suit in plaintiff's behalf and notified the defendant that they had a lien of fifty per cent on her claim. Subsequent to employing the attorneys

who filed her suit, plaintiff, at the request of her brother-in-law, went to see another lawyer named Jackson. Plaintiff had been advised to see this lawyer because he belonged to the same lodge as did her deceased husband. Plaintiff also talked to other lawyers about her case. With reference to employing Jackson she testified on cross-examination as follows:

"Q. How did you happen to go and see Jackson, and what did you say to Jackson when you saw him? A. I told him I had hired a lawyer.

"MR. BROWNE: I didn't hear that. A. I say I told him I had hired a lawyer and he said, 'Well, we will go see Jackson anyway,' and so they took me in a car to Jackson's office and they said, 'We don't know how we are going to do this. She has hired a lawyer. She has bungled the case all up now. She has hired a lawyer.' And Jackson said, 'Well, I don't know, I will call up and see how it is.' And he called up some place where they file these suits, and after he called he said, 'Yes, they have it on the file,' and he said, 'Well, there is always a way to work these things out.'

"Q. MR. BROWNE: Who said that? A. Jackson. And he would get it thrown out some way or another, and he said, 'Do you want me?', and I said, 'Yes,' because the Odd Fellows wanted me to have him, and I did, and I thought I could cut Browne and Grover out and I thought if Jackson—he said he would take it for twenty-five cents on the dollar, something like that.

"Q. Twenty-five per cent? A. Yes.

"Q. Your contract with Browne and Grover was how much? A. Fifty.

"Q. And it was to your advantage if Jackson could be employed to have him take your case? A. Yes. And I went up then after he took the case and everything and kept asking how it was coming along and he said, well, he was going to have to see the street car company.

"Q. This was Jackson? A. This was Jackson.

"Q. All right, go ahead. A. He said he was going to have to see them and I guess he did go to see them several times, and one day he told me the street car company would give me $2,000.

"Q. Jackson told you that? A. Yes.

"Q. What time was that he told you that? A. I don't remember when that was.

"Q. All right, go ahead. A. So I began getting pretty hard up and needing money to pay my rent and things, and I thought one day I would go to the street car company and get $2,000 they said they would give me.

"Q. (By the COURT): You mean that Jackson said they would give you? A. Yes, that Jackson said they would give, yes. And I was about to lose my filling station and owing rent and children

needing things and when I got down there he said he never told Jackson he would give me $2,000."

In December, a short time before Christmas, plaintiff went to defendant's place of business at Ninth and Brighton Streets for the purpose of locating the claim department. We will quote part of her testimony for the purpose of shedding light on the charge of fraud and mental incapacity.

"Q. You had bought a filling station? A. Yes.

"Q. What did you get it with? A. Where did you get the money? A. With the insurance that my husband had paid on me.

"Q. Insurance your husband left you? A. Yes.

"Q. What company? A. At the Metropolitan.

"Q. Metropolitan Life Insurance Company? A. Yes.

"Q. That was how much money? A. That was $2,000.

"Q. $2,000? A. Yes, and so I invested this money in a filling station and it didn't seem like it was doing much good. I had a big expense and my seven children and my mother and my stepfather and a big house and electric light bills and all this expense and my money getting away, so I thought to myself I would go to the street car and see if they would give me $2,000 without having any lawyer's fees.

"Q. You mean the $2,000 Jackson had mentioned? A. Yes, sir, and I went down to Ninth and Brighton to find out where the claim agent was and they told me 1500 Grand and I went up there and I seen a clerk back in there and he said that Mr. Carr wasn't in, he was out of the city.

"Q. Who was Mr. Carr? A. The head chief lawyer at the street car company.

"Q. This gentleman back here, sitting here at the table? A. Yes. So then when I got up there and he said he wasn't in and to call him up with the phone, and I had a phone in the house and tried to talk to him and find out whether he would be in, and it was such a hard job to bother with the phone I didn't do it, and I went back up there and he wasn't there at that time and so the third trip he was, and this man, I don't know his name, in the third office on the fourth floor—

"Q. (interrupting): You mean at the street car company's offices? A. Yes. He called Mr. Carr to see if he was busy and he wasn't busy and to bring me up and he brought me up and introduced me to Mr. Carr, 'This is Mrs. Powers.'

"Q. That is what he said, the clerk that took you up: 'This is Mrs. Powers?' A. Yes, sir, this other fellow, I don't know his name, 'This is Mrs. Powers.' And we got to talking about it and I told him about my husband and he said, 'You have no case against the street car company,' and I said, 'I haven't no case against the

street car company? Why? My husband got killed there, didn't he?' He said, 'Yes, but he was sitting on the track drunk.'

"Q. Who said that? A. Mr. Carr. And he said he wasn't at the car stop, that he was away from the car stop. 'Well,' I said, 'I heard he was, and you told Mr. Jackson that you would give me $2,000.' He said, 'Oh, no, I didn't.' He said, 'I will give you $250 as a donation, not as a settlement.'

"Q. Did he say $250 at first? A. He said $200 at first and I said that wouldn't cover my husband's funeral expense and he said, 'Then, I will raise it to $250.'

"Q. What did he say he would give it for? A. As a donation, not as a settlement. He said I didn't have any case and he told me about a little girl three and a half years old that had had a case against the street car company and she didn't have any money and she hadn't got it settled yet, and now she was twenty years old and the case being thrown out of court, that they throwed it out of court.

"Q. What else did he say, if anything? A. He said, 'I will do right by you and settle with you. Why, you might take it to court and get nothing.' He said, 'Your lawyers is only out cheating widows.'

"Q. What else did he say? A. Let's see—

"Q. (interrupting): What did he say about witnesses, if anything? A. He said, 'See, I have marked it up for court,' and he says, 'See, we have a number of witnesses and you have not got any.' . . .

"THE COURT: Just tell everything that was said there by both you and Mr. Carr. A. Yes. And then they called—I know his name now but I didn't then, Senator White, and took me downstairs.

"Q. They called Senator White of the street car company and took you downstairs? A. Yes.

"Q. What did they do with you down there? A. He had a lot of papers and he was writing on and fixing up and I didn't know what he was doing.

"Q. What did he do? A. He got me to sign my name to them papers and he handed me the papers after a while and wanted me to sign them.

"Q. Was there more than one paper? A. A lot of papers and after a while he handed them to me and wanted me to read them, but I couldn't read them, I was too worried thinking of my children and my filling station and my rent and the money and everything I was losing.

"Q. What was worrying you about your filling station at that time, Mrs. Powers? A. Well, I was losing everything I put in there, everything I invested. . . .

"Q. After that signing of papers when did you get your money?

A. I got it the next day, that being Friday, the next day was Saturday that I got the check. That was Friday and the next day being Saturday I got the check.

"Q. What month were you up there at the street car company's office, Mrs. Powers? A. December.

"Q. How near Christmas time? A. Well, in a few days I think was Christmas.

"Q. Within a few days of Christmas? A. Yes.

"Q. That was last December, 1929? A. Yes.

"Q. Before you got your money what did you do? A. I took the—before I got the money?

"Q. Yes, after you were up there talking to Mr. Carr and before you got your money the following day what did you do? A. I told my stepdaddy what I had done."

On cross-examination she testified as follows:

"Q. (By Mr. Hogsett): Did you regard Messrs. Browne and Grover as your attorneys at the time you made this settlement or not? A. No, it was Jackson.

"Q. You regarded Jackson as your attorney at that time? A. Yes.

"Q. And that is what you told Mr. Carr, isn't it? A. Yes.

"Q. And he called Jackson up in your presence, didn't he? A. He talked to him over the phone.

"Q. Yes, and he said to Jackson exactly what he was doing in your presence? A. He said Jackson was a gentleman.

"Q. I think he is, too, don't you? A. I think so, too, and I think they are here.

"Q. All right, that's your opinion and I am not here to dispute it.

"Mr. Browne: I don't think counsel, who is very well versed in argument, should volunteer so much in the record.

"Mr. Hogsett: She is arguing with me.

"Mr. Browne: I know, but she is just a woman.

"Mr. Hogsett: Very well, I will try to stay strictly in bounds.

"The Witness: I am not arguing.

"Mr. Hogsett: Very well, madam, I will try to be brief and you try to answer my questions and we will continue to get along.

"Q. (By Mr. Hogsett): When you were talking with Mr. Carr you told him you no longer regarded Browne and Grover as your lawyers? You made that clear to him? A. Why?

"Q. Well, now you are arguing with me and we cannot get along that way—

"The Court: Read her the question. (Question read by the reporter as above recorded.)

"A. Yes.

"Q. And that you were regarding Jackson as your lawyer? A. Yes.

"Q. And in your presence Mr. Carr called up Jackson and tol.l Jackson what he was doing with you, that is, what your transaction with him was? A. Yes, he wanted to know what he held on me, he wanted to know how much money or something that he ought to have—I don't know how to explain it.

"Q. See if I can explain it and help you make the idea clear: He called Jackson and told Jackson that you were in his office at the time talking about the matter, is that right? A. Yes.

"Q. And he was going to settle the case with you for $250? A. No, he didn't tell him how much.

"Q. He didn't tell him how much? A. No.

"Q. You tell, then, what he said. What did he say to Jackson? A. He wanted to know how much he was holding for me.

"Q. How much of an attorney's lien or interest he had in your case? A. Yes.

"Q. Now, was that it? A. Yes.

"Q. That was a fair statement of what he told Jackson? A. Yes.

"Q. And Jackson, as I understand, told him that he was making no claim and to give it all to you? A. Yes."

Plaintiff further testified that before she received the check she discussed the matter with her stepfather and he told her she had signed a full release and that she should not have done so. Plaintiff also admitted that she wrote with her own hand the following, at the bottom of the release, dictated to her by Mr. White, an employee of the defendant:

" 'I understand this is a full setlement and Kansas City Public Service Company does not agree to pay my attorniey aneys money as fee.' "

After cashing her check plaintiff did not see her attorneys until the latter part of February when she went to the Scarritt building for the purpose of discussing with Attorney Jackson a matter pertaining to the Odd Fellows Lodge and of the advisability of placing her children in an Odd Fellows home. She testified that she also on that occasion went to the Scarritt building for the purpose of seeing the attorneys who had filed her suit. To use plaintiff's language she testified as follows:

"I went up stairs to Mr. Browne and told him about it and asked him if he wouldn't get this thing set aside and open up a new trial."

Plaintiff offered evidence by two doctors and one expert psychologist to the effect that plaintiff was mentally subnormal and in their opinion, at the time she signed the papers releasing her claim against defendant, she did not understand the effect of what a settlement meant. The examination of plaintiff consisted chiefly in giving her the Stanford Revision of the Benit-Simon test, as described in Termin's "The Measurement of Intelligence." In addition to this examination they asked her to relate and to detail the

nature of her claim against the defendant and the negotiations as to the settlement. From an examination of the record comparing the testimony of these three witnesses plaintiff evidently related to each witness substantially the same story with reference to her case which was in harmony with her testimony at the trial on virtually all of the main points. We quote from the testimony of one of these witnesses what plaintiff told him about the case:

". . . And then she said she got so hard up for money, she was about to lose the filling station, and she just decided she would take things in her own hands and she would make the settlement herself, and she would save having to pay the lawyers any money, or anything of that sort, and she went down to the car barn and asked where she should go to where the street car company paid the claims and they told her down at Fifteenth and Grand, so she went down to Fifteenth and Grand and made inquiry of someone on the first floor of the building there and they told her she would have to see Mr. Carr, I believe it was Mr. Carr, I think that was the name, and she went up there and they told her Mr. Carr was out, to come back the next day, and she went back the next day and saw Mr. Carr and she was talking with him and told him this Mr. Jackson had told her that he was sure that she could get $2,000 and he said she might get $5,000 and she said Mr. Carr told her, 'You have no case against the company, you have no case at all,' he said, 'Your husband was drunk and sitting there on the track and he wasn't at the regular stop anyway and you would be just foolish to go ahead with any suit, because you wouldn't get anything at all.' He said, 'We don't owe you anything, but I feel sorry for you,' as she told it to me, 'you have several children and doubtless have had a hard time of it and we will just make you a donation of a couple of hundred dollars,' and she told him, 'Well, if you say I haven't got no case against the company why did Mr. Jackson say he was sure I could get $2,000?' and she said that Mr. Carr told her, 'Well, to help you out a little bit, you have had the expense of your husband's funeral, we will just give you $50 for that. We will give you $250, which is just a donation.' "

Note the following testimony by plaintiff on this point:

"Q. What did either of the four lawyers that discussed the amount of your case with you, the amount you might get, what advice did they give you? A. They didn't tell me anything. They was working on my case. I did this under them.

"Q. What was it you said about undermining them?

"MR. BROWNE: She said under them, she didn't say undermining.

"THE WITNESS: I did that under them, without them knowing when I done it.

"Q. (BY MR. HOGSETT): What do you mean by doing that under

them? A. They didn't advise me anything like that, I settled the case without them knowing.''

During the trial plaintiff amended her petition by adding the charge of mental incapacity to contract. The examination of plaintiff as to her mental condition, by the two doctors who testified for plaintiff, was made after this amendment.

Defendant also introduced evidence by a number of doctors including a doctor who had waited on plaintiff at various times during her illness. These witnesses all testified that although plaintiff was not above the average in mentality she possessed sufficient intelligence to understand ordinary business transactions.

Mr. Carr, who negotiated the alleged settlement with plaintiff, testified that he fully explained to plaintiff that in his opinion she did not have a meritorious case against defendant; that rather than go to the expense of trying the case he offered her $200 in full settlement; that plaintiff argued the merits of her case stating that she had heard there was evidence the deceased was not sitting away from the station and that $200 was a small sum for the death of her husband; that this amount did not cover the funeral expenses. Carr testified he then offered her $250 but would not pay her any more since the case was marked for trial. Plaintiff accepted the offer and was instructed to return the next day and receive her voucher. Carr testified that at no time during the negotiations did he ever mention making plaintiff a donation as she had testified.

Mr. White, who prepared the papers, testified that the release was read to plaintiff and to further insure plaintiff fully understood it was a full settlement he had plaintiff to write at the bottom of the release the notation referred to above.

Mr. Carr testified plaintiff told him, and this plaintiff admitted on the witness stand, that Browne and Grover had solicited the case the day after her husband had died. Carr testified that was the reason he refused to acknowledge the attorney's lien. Grover testified that someone from the painting company where the deceased had been employed had requested them to call and see the plaintiff about the case. That, however, is not material to the issues before the court. Carr and plaintiff's attorneys had some controversy over the lien and finally Carr mailed the attorneys a voucher of defendants for $125, being fifty per cent of the amount of the alleged settlement. The voucher was returned by the attorneys and the present suit filed immediately thereafter. One of plaintiff's attorneys in a conversation with Carr stated to Carr that he had waited too long to honor their lien; that they had prepared to file suit and would not accept the check.

Was the trial court justified, under the evidence, in setting aside the stipulation and judgment of dismissal on the ground of fraud? We think not. Carr, who represented defendant in the nego-

tiations for the settlement, was in possession of the facts with reference to the accident. That he told plaintiff in good faith she had no case cannot be disputed. Under plaintiff's own evidence the liability of defendant was doubtful. Carr told plaintiff her husband was sitting in a drunken stupor on the track west of the station at the time he was struck; that the operator of the car did all within his power to warn the deceased and to stop the car in time to avoid striking deceased. There is substantial evidence in the record to support each of these statements. Plaintiff knew Carr was representing the defendant. That is why she went to him and, as plaintiff herself testified, for the very purpose of making a settlement of her case. Carr asked her about her attorneys and plaintiff testified she informed Carr that Grover and Browne no longer represented her and Jackson was her lawyer. Carr called Jackson over the phone, in plaintiff's presence, and informed him plaintiff was there for the purpose of settling her case and inquired if Jackson claimed any fee. Jackson informed Carr he had no claim and that although plaintiff had talked to him a number of times about the case he did not consider himself her attorney because she had signed a contract with Grover and Browne. Plaintiff admits she told Carr that Browne and Grover had solicited the case and she had signed an affidavit to that effect. Carr for this reason refused to recognize their attorney's lien. Whether rightly or not is immaterial. That plaintiff considered the $250 as a donation and not as a settlement is not supported by the record. Upon a reading of plaintiff's evidence the conclusion is inescapable that the idea of the $250, as testified to by plaintiff at the trial, being a donation was an afterthought for the purpose of avoiding the effect of the settlement. There is not a scintilla of evidence in the record that Carr made any statement of fact to plaintiff, with reference to the case, that was not supported by substantial evidence. The record admits of no other conclusion than that plaintiff did as she testified on cross-examination: "They (her attorneys) didn't advise me anything like that, I settled the case without them knowing." Carr's expression of opinion that plaintiff had no case against defendants was based on substantial evidence and was made in good faith. Such an opinion, even if erroneous, cannot be made the basis for an action for fraud and deceit. It lacks bad faith and dishonesty. [12 R. C. L. 295, sec. 59; 26 C. J. 1079, sec. 20, also p. 1207, sec. 106; Allgood v. Tarkio Electric & Water Co., 6 S. W. (2d) 1. c. 55 (3, 4), and authorities there cited; Bockes v. Union Mut. Casualty Co., 232 N. W. 156, 1. c. 162 (5, 6).]

■ Neither do we deem the evidence sufficient to justify the finding that plaintiff did not understand the legal effect of the release. It is not necessary to the validity of a contract that the parties thereto should be mentally or intellectually equal. Where

no confidential relation or relation of trust exists parties may legally contract with each other if otherwise qualified, even though the one party is far superior to the other intellectually, so long as the other party is mentally capable of understanding the legal effect or ultimate result of the contract. [32 C. J. 728, sec. 498.] It was well said in Wilson v. Jackson, 167 Mo. 135, 66 S. W. l. c. 977: "It is not sufficient, in order to set aside a contract, to show that the man who complains was not as strong-minded as the one with whom he dealt. The wheels of commerce would cease to turn if that were the law."

The expert witnesses, who testified at the trial, were about equally divided on the question of whether plaintiff understood the meaning of the release and stipulation at the time the settlement was made. The evidence of plaintiff's doctors that she was mentally inferior was mainly based on an examination made immediately after that issue had been injected into the case. These witnesses testified plaintiff was unable to give the name of the President of the United States or of the Governor of our State, and also failed to give the correct answer to questions in mathematics, such as seven times seven, or eight times four, etc. When plaintiff's testimony, given at the trial, was read to the witnesses they could not detect anything out of the ordinary therein.

If plaintiff's testimony is carefully considered it reveals that she fully understood that when she received the $250 she had released defendant and made a full settlement of her claim. The evidence also convinces us that plaintiff fully understood and realized her case was a doubtful one and she stood a chance of not getting anything in a trial. Much is made of the fact that plaintiff did not understand the meaning of a number of phrases contained in the release and stipulation, for example: "dismiss with prejudice" and similar phrases. It was not necessary to the validity of the release for plaintiff to understand its various terms. If she understood at the time she was making a full settlement of her claim she cannot now avoid her contract as was said in Davis v. Howell, 52 S. W. (2d) l. c. 424 (5):

"To avoid a release or any other written contract on the ground of mental incapacity, it must be shown that the condition of mind of the party executing the release was such at the time of its execution that he did not comprehend the force and effect of the instrument which he signed. [Nelson v. Kansas City (Mo. App.), 30 S. W. (2d) 1044, 1047.]"

Plaintiff has cited a number of cases in support of the finding of the trial court. We will refer to a few. It is argued that in Gilliland v. Bondurant, 332 Mo. 881, 59 S. W. (2d) 679, Division One of this court held that in a case of this nature no particular fraud need be shown. A statement of law must always be considered in

the light of the facts upon which it was based. In the above case the defendant's attorneys pretended to represent the plaintiff, a minor, and filed suit on his behalf. An agreed judgment was entered. The opinion at page 682 correctly disposed of this point in the following language:

"But all authorities are unanimous in holding that no judgment in such a case will be permitted to stand when, upon a direct attack by a suit to set it aside, it is shown that the infant had no counsel in fact, and that the pretended suit for the infant was brought by attorneys representing the adversary."

It certainly is not difficult to distinguish that case from the one now before us. The fact proven in the Gilliland case, that the defendant's attorneys pretended to represent plaintiff when in fact they were representing the defendant, was of itself sufficient to show fraud. ▆▆ In the case before us plaintiff had able lawyers representing her. With full knowledge that Carr was representing defendant she went to him for the purpose of making a settlement. Under such circumstances the burden was on plaintiff to prove that fraud was practiced upon her in obtaining the release before a court would be justified in setting it aside. [Macklin v. Fogel Const. Co., 326 Mo. 38, 31 S. W. (2d) l. c. 18 (11, 12).] The fraud in the case of Macklin v. Fogel Const. Go., supra, cited by plaintiff, consisted of various statements of facts made by defendant's physician, who treated plaintiff for his injuries, as to the extent of plaintiff's injuries for the purpose of procuring a settlement. [See 326 Mo. 38, 31 S. W. (2d) l. c. 17 (7, 8).] No evidence was offered in the case before us of any false statements of facts made by Carr affecting plaintiff's case. The Macklin case holds that honest expressions of opinion are not actionable. The case of State ex rel. v. Trimble, 324 Mo. 353, 23 S. W. (2d) 162, is easily distinguishable from the present case. There the plaintiff had been injured in an automobile accident. The car in which plaintiff was riding and which was damaged, did not belong to the plaintiff. An insurance adjuster, representing the insurance company which carried liability insurance on the car of the defendant, went to plaintiff and represented to her that he was paying for the damages to the car; that it was necessary for all who were riding in the car at the time of the accident to sign the release. Later it was found that the release not only covered the damage to the car but also plaintiff's personal injuries. This court on certiorari held that the Court of Appeals erred when it held that plaintiff had not made a case of fraud for the jury.

We are not overlooking the principle of law that a court of equity would grant relief where an attorney experienced in the law by over-persuasion and over-reaching had obtained an unjust and unconscionable settlement from an inexperienced and ignorant person. Plaintiff cites and quotes at length from the dissenting opinion by

448

JOHNSON, J., in the case of Hayes v. Sheffeld Ice Co. (Mo. App.), 168 S. W. 294, which was approved on certification to this court in 282 Mo. 446, 221 S. W. 705. In that case the defendant settled with the plaintiff for $500 after plaintiff had secured a judgment for $4,000. The case was pending in the Court of Appeals at the time the settlement was made. That part of the opinion which plaintiff claims is especially applicable to this case is as follows, 168 S. W. 1. c. 306:

"This is not a proceeding by the attorneys based on a conspiracy to defraud them, but is one on behalf of plaintiff, who forsook his own lawyers, his natural protectors, and was enticed into the camp of the enemy to his own undoing. He had the right to ignore his lawyers and settle the case over their heads. [Curtis v. Railway, 118 Mo. App. 341, 94 S. W. 762; Wait v. Railway, 204 Mo. 491, 103 S. W. 60; Hurr v. Railway, 141 Mo. App. 217, 124 S. W. 1057; Whitwell v. Aurora, 139 Mo. App. 597, 123 S. W. 1045; Stephens v. Railway, 157 Mo. App. 656, 138 S. W. 904.] The judgment belonged to him, not to his lawyers, and, while acting in good faith and not for the mere purpose of defrauding them, he might legally settle the case with or without their knowledge or consent.

"Therefore he was acting within the scope of lawful right when he entered into and carried to the end negotiations for a settlement with the attorney of his adversary. The legal right of the attorney to carry on a clandestine negotiation with the adverse party may be conceded, for argument; but, on the other hand, it must also be admitted by every right-thinking person that it is highly improper from an ethical and moral point of view for him to do such a thing. The rules of professional ethics spring from considerations of morality and fair play. One reprobates an armed man who fights with weapons against the defenseless, and for a trained and able lawyer to overreach an ignorant and credulous antagonist in a settlement is just as reprehensible, and cannot be excused on the plea that he was discharging his duty towards his client and only availed himself of a legal right. Duty never requires a man to turn oppressor of the weak."

It is plain to be seen that the language of that opinion is not applicable to this case. Note plaintiff's testimony:

"Q. Did you regard Messrs. Browne and Grover as your attorneys at the time you made this settlement or not? A. No, it was Jackson.

"Q. You regarded Jackson as your attorney at that time? A. Yes.

"Q. And that is what you told Mr. Carr, isn't it? A. Yes.

"Q. And he called Jackson up in your presence, didn't he? A. He talked to him over the phone."

Carr was not in duty bound to call Grover and Browne, as plain-

tiff--had informed him that she no longer considered them as her attorneys. Carr displayed good faith when he inquired of plaintiff the names of her attorneys and called Jackson and informed him plaintiff was there to settle her case. Neither did the plaintiff in the case before us have a judgment as did Hayes in the case mentioned, but plaintiff only had a very doubtful claim. Neither was plaintiff enticed into the camp of the enemy, but she went there deliberately for. the purpose of affecting a settlement. Again, in the Hayes case, the attorney informed the plaintiff that plaintiff's lawyer had admitted the judgment would have to be reversed and a new trial granted. This was a false statement of a material fact.

Plaintiff's attorneys in this case evidently did not consider the settlement as grossly fraudulent or unconscionable because they, after talking to plaintiff and learning of the settlement with full knowledge of the merits of the original suit, asked Carr to honor and pay their attorney's lien. Carr refused on the ground, as above stated, that the case had been solicited. However, after some negotiation he did mail the attorneys a check for their fee. This check was refused, one of the attorneys stating Carr had waited too long to honor their lien. Suit was filed March 20, about a month after the attorneys learned of the settlement and nearly three months after the settlement was made.

We hold the evidence failed to prove that any fraud was practiced on plaintiff, or that in the settlement, because of her alleged mental inferiority, she was overreached by defendant's counsel. ·· The judgment of the trial court is hereby reversed. *Cooley* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.